ARKANSAS DEPARTMENT OF HUMAN SERVICES *v.*
R.P.

97-767 970 S.W.2d 225

Supreme Court of Arkansas
Opinion delivered June 11, 1998
[Petition for rehearing denied July 9, 1998.]

*Winston Bryant*, Att'y Gen., by: *Kelly K. Hill*, Deputy Att'y Gen., for intervernor.

ANNABELLE CLINTON IMBER, Justice. In this case, the juvenile court ordered the Department of Human Services to provide adequate housing, including electric and water utilities, to a family adjudicated in need of services. Following a period of time during which the utilities were not turned back on, the trial court held DHS, as well as a DHS employee, Sandi Doherty, in willful contempt of its order. On appeal, DHS argues for various reasons that the trial court lacked the authority to order it to restore the utilities. Additionally, both DHS and Doherty contend that the trial court erred in holding them in contempt of court. We affirm as modified.

The underlying matter began as a probation-revocation proceeding on a juvenile, R.P. At a hearing in the matter on August 5, 1996, Therese P., R.P.'s mother, explained that all utilities in the family home had been shut off. The prosecutor expressed an interest in converting the matter to a family-in-need-of-services petition, as did R.P.'s guardian ad litem. The trial court opined that the revocation petition needed to be dismissed, and that a family-in-need-of-services petition should be filed. The court also stated that DHS would be ordered to provide supportive serv-

ices and to do a needs assessment for the family. R.P. was released into the custody of her mother. On August 13, 1996, an order was entered dismissing R.P.'s delinquency petition with the notation that "FINS case to be opened with supportive services offered by DHS." On August 15, a FINS petition was filed by the prosecutor.

At a hearing on September 5, the prosecutor explained that the P. family had gone without water or electricity. R.P. had already missed four-and-a-half days of school, in the prosecutor's opinion, due to "dire circumstances" including the lack of transportation, electricity, and water. Therese P. testified that they had no electricity or water. She had applied for disability and food stamps. Heather Harper, a DCFS caseworker, stated that DHS could not pay the full amount of the water or utilities, "It's outrageous." "We were willing to help, but we can't pay the full amount." She had advised Therese P. where she could go for help other than DHS. The trial court concluded the hearing by finding that the P. family was a family in need of services.

At a hearing on September 30, Pam Cooper, Harper's supervisor, explained that they had tried to help the family, and had provided transportation. They had also tried to put money together on the utilities from community providers, but the bills were several hundred dollars. She stated that it was her understanding that "Judge Reynolds expected us to pay their bills for them. And, I have no way to accomplish that. I've talked with my area manager about it, on two different occasions, and there's just — we don't have the budget to do that. So, we've done what we can."

According to Therese P., the light company would turn her lights back on if she paid half, $268. R.P. told the trial court that the lack of electricity was a problem because the wind-up clock she had did not work well and she was late for school. Harper stated that they had made an arrangement with the medicaid office for transportation, as well as a number of referrals and contacts regarding the utility problems. According to Harper, the water bill was $550, which had been reduced by the water company from $660. Apparently, the home had a leak, leading to high

water bills. The guardian ad litem asked R.P. whether she would rather be in a foster home or in her current home without heat and running water, and R.P. expressed that she would rather stay in her current home.

The trial court ultimately stated that it was going to order DHS to pay for having the water and electricity turned back on, explaining that the only alternative was to place R.P. in the custody of DHS. Brian Rogers, a DHS attorney, stated that if DHS was directly ordered to pay something, "I should raise the issue of possible sovereign immunity in ordering a state agency to directly to pay for something, when we're not actually a party to a case. So, I've raised that issue now." The trial court responded: "Sovereign immunity? Well, perhaps I should clarify the order, somewhat, and direct that [DHS] provide adequate housing for this family, including facilities with water and electricity." An order entered on September 30 reflects a full review of the FINS matter, and sets a date for the next review. Within "Additional orders" is a handwritten notation providing "[DHS] is to provide adequate housing for the [P. family] — including water and electricity."

On October 10, DHS filed a motion to set aside this order pursuant to Ark. R. Civ. P. 60(c) and 59(a)(6). In its motion, DHS asserted sovereign immunity, and that "The State, or its agencies, may not be compelled to expend funds not appropriated by the General Assembly of the State of Arkansas."

At a hearing on October 17, the guardian ad litem raised the issue that court-ordered services had not been provided. Rogers responded that DHS had provided some services. Harper stated that she had made phone calls trying to get funds, and recited what she had done in order to obtain adequate housing. According to Harper it was going to take $400 to get the water turned back on. Therese P. stated that it would take $268 to get the electricity turned back on, but Harper remembered $550. Harper said that $3000 was appropriated to Faulkner County for "prevention of foster care, which is what this would come under." Freda Cruse-Phillips, a DHS area supervisor, said that the P. family did not meet the criterion for that money, because the child was not at risk of removal from the home.

The trial court asked Harper what she had done to carry out the September 30 order. She said that she told her supervisor (at the time Pam Cooper), who in turn called the area manager for approval. She got an e-mail back from the area manager, Sandi Doherty, saying not to pay it. Phillips explained that the decision to go outside the boundaries of the "policy" that governs expenditures of state and federal money is left to "Ms. Jones, or to Tom Dalton, or perhaps even the governor," and one of the primary considerations is whether the child was at risk. From everything she could see, the child was not at risk of removal. The trial court asked whether approval was sought from Dalton, to which Phillips answered no. Phillips later said that if it was $600 or $800, DHS could pay that, but if the bills were $1700, it could not. Harper stated that the bills were over $1300.

The trial court announced that it would issue a show cause order for Doherty for failure to abide by the court's order. The court asked Rogers if he could accept service. Rogers stated that he would like a copy and he would provide it to Doherty, but he would also like for her to be personally served. The trial court responded "all right[,]" and then stated that "where we need to go from here" is for $668 to get paid to get the utilities turned back on.

The trial court then asked Phillips if there was any reason that DHS was not going to pay the $660 immediately. She responded that it exceeds what she or a county supervisor would be allowed to approve, so it would require Doherty's approval. Phillips further testified that "her communication that she has by E-mail from — to — to Pam Cooper, as of September the 26th, was that there was no reason to pay this bill. So I'm not sure that it is a matter of amount to her. I will have to get with her and discuss what the Court's ruling is today and see what we can do."

The record reflects a show-cause order dated October 30, and filed on November 12, directing Doherty to appear and show cause "on the 21st day of November, 1996, at 2:00 p.m. to show cause why she should not be held in contempt of court and punished accordingly[.]" On November 21, the trial court held a hearing in the matter. Harper testified that she had called numer-

ous agencies regarding the P. family, and had obtained $347 for the AP&L bill: $200 from CAPCA, $71.50 from Red Cross, $21.50 from St. Joe, and $50 from St. Peters. She stated that AP&L would probably turn it back on Monday, pending more proof of disability. Harper testified that they had provided transportation and counseling to R.P. She had taken them an AFDC application, and they were receiving $162 in AFDC and food stamps. R.P. went to a friend's house for the bathroom. There was no guarantee that Dick Longing, the mortgagee of the P. family home, would not foreclose on the house.

Phillips testified that DHS had not paid the P. family's rent, nor the water or utility bills, but had provided case work and services to find community providers who could assist. When asked why DHS went "begging and pleading" to community providers for funds, she answered that "[R.P.] did not meet the immediate criteria for any programs that we had to offer her any other kind of assistance." She did not believe that the court intended for DHS to pay directly, "but to insure that it was paid. And, we've made every effort to insure that it would be paid."

Following this testimony, the trial court denied DHS's motion to set aside, and then took up a review of the case and the contempt matter. Kay Forrest, from DHS's office of chief counsel, explained that although Doherty was personally served with the show cause order on "Friday, the 15th," Tom Dalton, as DHS's director, should have been served rather than Doherty. The prosecutor stated that "these errors" in service "will be made proper in the next two days, and we can set this case for the hearing that it deserves." The contempt matter was then continued to December 5. The parties again discussed the issue of whether the utilities were going to be turned back on. The trial court stated that "the previous orders of the Court are in effect. And, for the purpose of clarification, if any is needed, the Department is to provide cash assistance to the family for the purposes of establishing electricity and water to the home in which they are currently living or providing other adequate housing."

On December 4, the trial court entered an order denying DHS's motion to set aside, and the record shows that the same day

show-cause orders were issued for Doherty, Tom Dalton, Beverly Jones, and Boyd Ward. This show-cause order provided that on September 30, DHS and its agents were ordered to pay cash assistance for electricity and water for R.P. in the home in which she was living or provide other housing. "That to date [DHS] has failed and refused to pay said amounts." The order directs DHS and its agents, Tom Dalton, Beverly Jones, Boyd Ward, and Sandy Doherty to appear on December 11 to show cause. Although Dalton, Jones, and Ward were personally served with the order (as well as Doherty by telephone), only Ward appeared at the December 11 hearing.

At the hearing on December 11, Kay Forrest stated that DHS funds were used to restore the P. family's utilities on November 25. Cooper, former DCFS supervisor in Faulkner County, testified that she attended the September 30 hearing. At that time, she understood DHS was ordered to pay the past-due electric bill and the past-due water bill. After the September 30 hearing, she e-mailed her supervisor, Sandi Doherty, advising that the court had ordered DHS to provide adequate housing. Cooper received an e-mail back instructing her to ask Brian Rogers to file an immediate appeal, and not to pay the bills. Doherty's e-mail asked Cooper how she and the mother interpreted adequate housing. During a face-to-face conversation with Doherty on October 1, Cooper clarified that she thought the order meant that DHS was to get the electricity and water turned on. In Cooper's opinion, R.P. was not at risk at the time of the September 30 order.

Phillips testified that sometime on September 30 or thereafter, she became aware of a court order to provide adequate housing, including utilities and water. She told Cooper that R.P. did not meet the criteria for cash assistance and that she would have to go to Doherty to get any kind of waiver to that program. Cooper e-mailed Doherty, and she indicated that she was not to use "those funds" to pay the bills. Phillips was present at the hearing on November 21 when the trial court found that the child was at risk. "Her order" superseded "our policy," and therefore "we didn't have any problem accessing the cash assistance by the state and federal mandates we operate under." Harper testified to her efforts to get third parties to help with the bills. Even prior to any

court order, she knew that the policy with regard to payment of bills was to find alternate resources other than cash from DHS. This December 11 hearing concluded with the trial court issuing a body attachment for Doherty, who had not appeared.

On December 16 the trial court took up the contempt matter. Doherty testified regarding an e-mail that Cooper sent her on September 26 concerning R.P.'s case. Cooper sent her another e-mail on September 30. Cooper told her that "Court was today and Judge Baker ordered us to pay the water and electric bill and a plumber to repair the leak that had caused the water bill to be outrageous." Because Brian Rogers had "brought up some law about ordering the state agency to pay a bill, Judge Baker amended the order to say 'Provide the family with adequate housing.'" When asked by Cooper what she should do, Doherty responded that she should proceed with community providers and to contact an attorney to file an appeal. Doherty believed that she complied with the order, and that the judge did not mean for DHS to "write a check, to do cash assistance." She did not tell any of her staff to disobey the order. When the trial court denied DHS's motion to set aside on November 21, she ordered the bills paid.

Following this December 16 hearing, the trial court entered an order finding that DHS, through Sandi Doherty, willfully and intentionally violated its September 30 order. The court further found that Doherty willfully and intentionally acted with the direct purpose of disobeying the court's September 30 order. Doherty was found to be in contempt for fifty-three days, constituting fifty-three separate acts of contempt. She was ordered to serve one day in the county prison for each act of contempt.

DHS filed a notice of appeal from the order denying its motion to set aside the September 30 order, as well as from the contempt order. Doherty also filed a belated notice of appeal from the contempt order with permission from this court. Although appellee did not file a brief, the State has intervened and filed a brief in response.

*I. DHS's appeal from the September 30, 1996 order.*

 *A. Standing and timeliness issues.*

Intervenor suggests that DHS, as a non-party below, lacks the requisite standing to appeal from the September 30 order without having intervened below or initiated an original action in the trial court. Alternatively, intervenor argues that DHS's notice of appeal from the September 30 order was untimely under the timeliness provisions of Ark. R. Civ. P. 59 and 60 and Ark. R. App. P.—Civ. 4. We reject these arguments and hold that DHS possesses the requisite standing to appeal, and that its notice of appeal was timely filed.

The matter is resolved by *Arkansas Dep't of Human Servs. v. Crunkleton*, 303 Ark. 21, 791 S.W.2d 704 (1990), and *Arkansas Dep't of Human Servs. v. Bailey*, 318 Ark. 374, 885 S.W.2d 677 (1994), where this court laid down the path for DHS to take when appealing matters in similar circumstances. In *Crunkleton* DHS attempted to appeal from a judgment awarded against it for disbursements made to it for a child-support arrearage. While we suggested that the award violated principles of sovereign immunity, we dismissed the appeal since DHS was not a party to the litigation below. We held that DHS must first attempt to obtain relief in the trial court. *But see In the Matter of Allen*, 304 Ark. 222, 800 S.W.2d 715 (1990) (stating that the *Crunkleton* court failed to follow the "long recognized exception" that a person "pecuniarily affected by a judgment" but not a party may nonetheless bring a direct appeal where the action has been taken without notice to the one complaining).

*Crunkleton* was followed by *Bailey*, where this court once again held that DHS was precluded from bringing a direct appeal from an order requiring it to pay for treatment in a FINS case that it had not initiated and was not a party to. Although DHS argued that the case was distinguishable from *Crunkleton* in that it had filed a Rule 60 motion to set aside, we noted that "DHS has not appealed the denial of its motion to set aside the judgment which would have been the proper procedure." *Bailey, supra.*

In the present case, DHS has followed the "proper procedure" prescribed by this court in *Bailey*. It first sought relief from the trial court by filing a motion to set aside following the September 30 order. While intervenor suggests that this motion should have otherwise been governed by the timeliness provisions of Rule 59 and 60, the fact remains that DHS was never a "party" to the underlying action for purposes of those rules. Pursuant to *Bailey*, it had no final judgment to appeal from until the trial court entered an order denying its motion to set aside. Under the circumstances of this case, we conclude that DHS has standing and has filed a timely notice of appeal from the trial court's order denying its motion to set aside the September 30 order.

### B. Statutory authority.

DHS first contends that the trial court's September 30 order did not comply with the juvenile code. It cites us to its policy "V-C," and Ark. Code Ann. § 9-27-303(17) (Repl. 1993)[1], which provides a list of instances in which "family services" may be provided:

> "Family services" means relevant services, including, but not limited to: child care; homemaker services; crisis counseling; cash assistance; transportation; family therapy; physical, psychiatric, or psychological evaluation; counseling; or treatment, provided to a juvenile or his family. Family services are provided in order to:
>
> (A) Prevent a juvenile from being removed from a parent, guardian, or custodian;
>
> (B) Reunite the juvenile with the parent, guardian, or custodian from whom the juvenile has been removed; or
>
> (C) Implement a permanent plan of adoption, guardianship, or rehabilitation of the juvenile.

DHS contends that none of the three criteria for family services were met in this case.

---

[1] In 1997, the General Assembly substantially amended the Juvenile Code. We provide citations to the statutes in effect at the time the case was decided below.

To the contrary, at the September 30 hearing, the trial court unequivocally stated that it was ordering services to prevent R.P. from being removed from her mother. "Well, I think I'm going to order the Department to pay for having the water and electricity turned back on. The only alternative is to take R.P. into custody of the Department." This conclusion was supported by evidence of the detrimental effect of R.P.'s living conditions. The evidence to that point established that the P. family still had no water or electricity at the house. DHS did not dispute the trial court's finding that R.P. was a member of a family in need of services, and Cooper stated at the September 30 hearing that DHS would "certainly" put R.P. in a foster home "if [the trial court] want[ed] to put her in a foster home." The prosecutor at one point suggested that R.P. was not able to bathe and present herself appropriately for school. In sum, the trial court's order did not exceed the statutory criteria for family services as set forth in Ark. Code Ann. § 9-27-303(17) (Repl. 1993).

An implicit facet of DHS's argument seems to be that the September 30 order was defective because the trial court failed to make written findings in accordance with Ark. Code Ann. § 9-27-328(a) (Repl. 1993), which requires that the court order family services appropriate to prevent removal before removing the juvenile from the custody of her parent. It is clear that the statute requires specific findings only when the court orders actual removal from a custodial parent. Thus, we decline to hold that the trial court's order was defective under Ark. Code Ann. § 9-27-328 (Repl. 1993).

With regard to DHS's contention that the trial court's order did not comport with its policy, this court has previously held that the juvenile court's orders do not have to comply with DHS policy. See Arkansas Dep't of Human Servs. v. Clark, 304 Ark. 403, 802 S.W.2d 461 (1991) ("Clark I") (there is nothing in the juvenile code "that even arguably requires the juvenile court to fashion its orders within the policy guidelines of DHS"). Significantly, the record does not show that DHS could not have paid the bills at the time of the September 30 order. See Clark I, supra (trial court did not order DHS to disburse a greater amount than the maximum allowable under its policy — DHS did not

claim that funds were unavailable and did not offer evidence of such). There were funds available to pay the bills, but it was DHS's position that paying the bills would be to the detriment of other families in need of the same money. Based on these circumstances, the trial court did not exceed its statutory authority in its September 30 order.

### C. Constitutionality of the September 30 order.

#### 1. Sovereign immunity.

When DHS first moved to set aside the trial court's September 30 order, it argued that it was entitled to assert sovereign immunity and could not be made a defendant without waiving sovereign immunity. On appeal, DHS argues that the trial court's order coerced DHS into bearing a financial burden, which is barred by the doctrine of sovereign immunity. While intervenor suggests that this argument was not made below, our review of the record shows that the issue was sufficiently developed. Additionally, we decline to find, as intervenor suggests, that sovereign immunity has been waived simply because the prosecutor filed the FINS petition here. DHS was never the initial moving party in these proceedings. *See Arkansas Dep't of Human Servs. v. State*, 312 Ark. 481, 850 S.W.2d 847 (1993).

However, we nonetheless find that there is a waiver of sovereign immunity under the circumstances presented. This court has recognized an exception to the doctrine of sovereign immunity where an act of the legislature has created a specific waiver of immunity. *See State of Arkansas Office of Child Support Enforcement v. Mitchell*, 330 Ark. 338, 954 S.W.2d 907 (1997); *State v. Tedder*, 326 Ark. 495, 932 S.W.2d 755 (1996). Unlike the statutes at issue in *Arkansas Department of Human Servs. v. State*, 312 Ark. 481, 850 S.W.2d 847 (1993), or *Arkansas Dep't of Human Servs. v. Crunkleton*, 303 Ark. 21, 791 S.W.2d 704 (1990), the Juvenile Code expressly empowers the court to order cash assistance in FINS cases. When a family is found to be in need of services, the court may order "family services." Ark. Code Ann. § 9-27-332(1) (Repl. 1993). The following are included within the definition of "family services":

"Family services" means relevant services, including, but not limited to: child care; homemaker services; crisis counseling; *cash assistance*; transportation; family therapy; physical, psychiatric, or psychological evaluation; counseling; or treatment, provided to a juvenile or his family. Family services are provided in order to:

(A) Prevent a juvenile from being removed from a parent, guardian, or custodian;

(B) Reunite the juvenile with the parent, guardian, or custodian from whom the juvenile has been removed; or

(C) Implement a permanent plan of adoption, guardianship, or rehabilitation of the juvenile.

Ark. Code Ann. § 9-27-303(17) (Repl. 1993) (emphasis added). A FINS petition may be initiated by any adult. Ark. Code Ann. § 9-27-310(b)(3)(A) (Repl. 1993). Before a juvenile may be removed from a parent, the court is required to order family services appropriate to prevent removal. Ark. Code Ann. § 9-27-328(a) (Repl. 1993).

■ Given that the trial court is empowered to order family services in FINS cases to prevent a juvenile from being removed from a parent, which by definition includes cash assistance, we conclude that the General Assembly has specifically waived sovereign immunity as to DHS in such instances. Any other interpretation would effectively eviscerate the court's power to order family services in FINS cases. This is especially true considering that a FINS case may be initiated by "any adult," where DHS will not be the initial moving party. Such a consequence could not have been intended by the General Assembly in enacting the Juvenile Code.

### 2. Separation of powers.

■ DHS also argues that the September 30 order violated separation of powers, but we decline to reach the merits given that this theory was not sufficiently raised or developed below with respect to setting aside the September 30 order. *See Stricklin v. Hays*, 332 Ark. 270, 965 S.W.2d 103 (1998) (*supp. opinion on denial of reh'g*, Ark. slip op. May 7, 1998). DHS concedes that its motion to set aside "did not discuss the doctrine of separation of

powers by name or at any length," but asserts that its separation of powers issue is preserved by the language in its motion and amended motion to set aside that "both the State and its agencies may not be compelled to expend funds not appropriated by the General Assembly of the State of Arkansas." However, our review of the record shows that DHS's separation of powers argument on appeal was not presented to the trial court. Based on the foregoing, the trial court did not abuse its discretion in denying DHS's motion to set aside the September 30 order.

## II. DHS's appeal from the contempt order.

### A. Due Process.

DHS first argues that the trial court erred in holding it in contempt because its orders did not conform with constitutional requirements of due process. DHS essentially makes two separate arguments, the first is that the September 30 order was indefinite as to the obligations imposed upon DHS, and second that the trial court's show-cause orders were insufficient to give it notice.

DHS primarily relies on *Gatlin v. Gatlin*, 306 Ark. 146, 811 S.W.2d 761 (1991), and *Arkansas Dep't of Human Servs. v. Gruber*, 39 Ark. App. 112, 839 S.W.2d 543 (1992). In *Gruber* DHS argued that the trial court erred in holding it in contempt after one of its representatives failed to appear at a placement hearing. The court of appeals rejected DHS's jurisdictional argument. "Even one not a party to an action, who has been served with an order, or who has notice of it, may be held in contempt of the order. [Citation omitted.] Before a person may be held in contempt for violating a court order, the order must be in definite terms as to the duties imposed upon him and the command must be expressed rather than implied." *Id.* The DHS representative there was given notice in open court, as well as in writing, of the date and time to appear for the placement hearing. "One who has full knowledge of a court order and its import, as DHS did, cannot flout it with impunity." *Id.* In *Gatlin* this court similarly reiterated that a person may not be held in contempt for violating a court order unless the order is definite in its terms as to the duties

imposed upon the person and the command must be express rather than implied.

■ We reject DHS's argument that the September 30 order was somehow vague as to the obligations imposed upon it. The order provided that "Dept. of Human Services is to provide adequate housing for the [P. family] — including water and electricity." The evidence shows that DHS knew that the purpose of the order was for it to restore utilities to the P. family home. At the September 30 hearing, Cooper stated that "Judge Reynolds expected us to pay their bills for them. And, I have no way to accomplish that. I've talked with my area manager about it, on two different occasions, and there's just — we don't have the budget to do that. So, we've done what we can." Cooper later testified at the December 11 hearing that it was her understanding that the court ordered DHS to pay the past-due electric bill and the past-due water bill. This was communicated to Doherty via e-mail, who responded with instructions to contact an attorney to file an appeal, and to not pay the bills. She also had a conversation with Doherty where she explained that she thought the order meant that DHS was to get the electricity and water turned on. Although the September 30 order does not mention cash assistance, DHS knew that it was to restore the utilities within a reasonable amount of time.

■ We also find meritless DHS's claim that its notice of the show-cause hearing was constitutionally deficient.[2] Arkansas Code Annotated § 16-10-108 (Repl. 1994), governing the court's power to punish for criminal contempt, provides in part that "the party charged shall be notified of the accusation and shall have a

---

[2] DHS intersperses its constitutional argument with the notion that the service of process provisions of the Rules of Civil Procedure should have applied to the show-cause order. There can be no doubt that the proceedings in the present case were for criminal contempt. The purpose of a criminal contempt proceeding is to preserve the power and vindicate the dignity of the court and to punish for disobedience of its order. *Fitzhugh v. State*, 296 Ark. 137, 752 S.W.2d 275 (1988). By comparison, civil contempt proceedings are instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders made for the benefit of those parties. Here the trial court was punishing DHS for disobedience of its order, and the service provisions of the Rules of Civil Procedure are simply inapplicable.

reasonable time to make his defense." This court has also held that the Due Process Clause, as applied in criminal proceedings, requires that an alleged contemnor be given notice of the charge of contempt pending against him and to be informed of the specific nature of the charge. *Fitzhugh v. State*, 296 Ark. 137, 752 S.W.2d 275 (1988). In *Fitzhugh* this court reversed a criminal contempt finding imposed upon an attorney where the attorney never received notice that he was charged with contempt.

▪ While DHS makes much of the fact that it received no written notice of the first scheduled show-cause hearing on November 21, the fact remains that it was served on December 6 with the show-cause order directing it to appear for the December 11 hearing. This order provided "That on the 30th day of September, 1996, [DHS] and its agents were ordered by this court to pay cash assistance for electricity and water for R.P. in the home in which she is living or to provide other adequate housing. That to date [DHS] has failed and refused to pay said amounts." Under these circumstances, we hold that DHS received notice comporting with due process and the requirements of Ark. Code Ann. § 16-10-108.

### B. Sufficiency of the evidence.

▪ Here DHS argues that the trial court erred in finding that its actions were willful and constituted contempt beyond a reasonable doubt. This point is in actuality a challenge to the sufficiency of the evidence on the contempt finding. In a criminal contempt proceeding, proof of contempt must exist beyond a reasonable doubt. *Jolly v. Jolly*, 290 Ark. 352, 719 S.W.2d 430 (1986). On appellate review, we consider the evidence in the light most favorable to the trial court's decision concerning the contempt and affirm if there is substantial evidence to support its decision. *Arkansas Dep't of Human Servs. v. Clark*, 305 Ark. 561, 810 S.W.2d 331 (1991) ("*Clark II*").

*Clark II* is illustrative on this point. The contempt finding at issue there involved DHS's failure to comply with an order of the trial court to provide transportation to a family and to provide the remainder of available preventative funds. With regard to the

transportation issue, the evidence showed that there had been a two-month delay in obtaining bus tokens without justification. With respect to the disbursements, the evidence showed that DHS was aware that certain cash disbursements were ordered, but explained that payment of the money was not in compliance with agency policy and could result in an audit leading to a penalty of funds reduction. DHS additionally explained that it thought that its staff was under the impression that the case was on appeal and assumed a stay order had been obtained. The trial court found DHS in contempt, rejecting DHS's argument that it did not act "willfully." The trial court stated that "there are various degrees of willful as there are various types of being willful, and I think in an agency this big, you're going to have some lags in time, and we understand that. What I'm concerned with is, I think the agency just deliberately did not do very much to comply with the Court's order until pretty much the eleventh hour." *Id.*

The *Clark II* court affirmed, observing that the trial court's statement was not an "inapt characterization of the proof offered by DHS to explain its inaction, and while it may not have been motivated by rancor, neither was it inadvertent." *Id.* There was substantial evidence to support the trial court's finding that DHS was in willful contempt. "It was undisputed the order was not complied with and we find no basis for disagreement with the conclusion of the trial court that DHS's failure to act constituted willful contempt." *Id.*

In the present case, the substance of DHS's argument is that there was no willful noncompliance with the trial court's order because it made ongoing attempts at compliance, and that it never intended to disobey the court order. In particular it highlights Harper's efforts to obtain support for the P. family from community providers. Given these "alternative methods" made until the motion to set aside was heard, it reasons that "their efforts could never be defined as willful disobedience."

We disagree. As already discussed above, DHS understood the trial court's order to require it to restore the utilities. Nonetheless, Doherty specifically informed Cooper not to pay the bills. The very fact that DHS immediately took the position that its

own funds could not be used to pay the bills substantiates the notion that it knew it was to pay the bills with its own funds if it could not otherwise restore the utilities. While the evidence showed that Harper made efforts to obtain funds through community providers, the fact remains that the bills were not paid until the end of November.

 While DHS "may not have been motivated by rancor," neither was its failure to pay the bills "inadvertent." *Cf. Clark II, supra.* Considering the evidence in the light most favorable to the trial court's decision concerning the contempt, the trial court had substantial evidence before it with which to conclude that DHS was in willful contempt of its order.

C. *Separation of powers.*

 DHS also argues that the trial court erred in finding DHS in contempt due to the doctrine of separation of powers. Its contention is that the trial court usurped the executive branch's power of allocating and disbursing resources for family services which were appropriated by the legislative branch. We agree with intervenor that we are precluded from reaching the merits of this point as it is in substance an attack on the underlying order. In *Carle v. Burnett*, 311 Ark. 477, 845 S.W.2d 7 (1993), this court stated that "the law is long settled — where the failure or refusal to abide by an order of the court is the issue, we do not look behind the order to determine whether the order is valid." Because DHS is merely attempting to challenge the underlying order here, we decline to set aside the contempt finding based on separation of powers.

D. *Judicial Bias.*

Finally, DHS argues that the contempt order should have been set aside due to instances of bias on the part of the trial court. In its brief it writes that the trial judge "should have recused herself from the contempt hearings on December 11 and 16, 1996, as requested in [DHS's] motion to amend brief and judgment."

While DHS points to a number of actions by the trial court which DHS contends reflect judicial bias and should have resulted

in the trial court's recusal, we deal only with the instance actually brought to the trial court's attention. *See Franklin v. State*, 314 Ark. 329, 863 S.W.2d 329 (1993) (issue of bias may not be raised on appeal absent objection below). In its motion to amend judgment filed on February 10, 1997, DHS argued that the January 31, 1997 order should be set aside under Rule 59(a)(1) in order to prevent a miscarriage of justice. Majore Kesl, an attorney for the Office of Chief Counsel, submitted an affidavit in which she stated she was present with the trial court on December 10, 1996, when the court reporter informed the trial court during an in-chamber conference that Doherty was out of the state and would not be at the upcoming hearing. The trial court's response was to comment that she was going to have to put Sandi Doherty in jail. DHS argued in their motion that the trial court had pre-judged the case and should have recused from the December 11 contempt hearing.

Judges must refrain from presiding over cases in which they might be interested and must avoid all appearance of bias. *Reel v. State*, 318 Ark. 565, 886 S.W.2d 615 (1994). To decide whether there was an abuse of discretion, we review the record to determine if any prejudice or bias was exhibited. *Id.* The question of bias is usually confined to the conscience of the judge. *Noland v. Noland*, 326 Ark. 617, 932 S.W.2d 341 (1996). Judges are presumed to be impartial, and the party seeking disqualification has the burden of showing otherwise. *Turner v. State*, 325 Ark. 237, 926 S.W.2d 843 (1996).

While we are inclined to hold that DHS failed to even preserve this issue due to a failure to timely object at the first opportunity, we nonetheless affirm on the merits as the alleged instance of bias is not enough to warrant the trial court's recusal. While it certainly evinces displeasure and frustration on the part of the trial court, we cannot say that the trial court erred in denying DHS's motion to amend judgment on grounds of judicial bias.

*III. Sandi Doherty's appeal from the contempt order.*

*A. Jurisdiction of the trial court.*

 As with DHS, Doherty also argues that the trial court erred in finding her in contempt in that the September 30 order was indefinite as to any obligations imposed upon her individually, and that she never received sufficient notice of the show-cause hearing. While it is true that Doherty is not named in the September 30 order, we have no hesitation in holding that the order was in definite terms as to the duties imposed upon Doherty, and the command was express rather than implied. *See Henry v. Eberhard*, 309 Ark. 336, 832 S.W.2d 467 (1992); *Gruber, supra.* The evidence clearly shows that Doherty had knowledge of the September 30 order, and that she specifically instructed her subordinate not to pay the bills with DHS funds. Water and electricity were not provided to the P. home until late November. One who has full knowledge of a court order and its import cannot flout it with impunity. *See Gruber, supra.*

Doherty also argues that the contempt finding should be reversed because she did not receive adequate notice of the show-cause hearing. She primarily chooses to emphasize the fact that she was not personally served with the show-cause order for the hearing on December 11. An affidavit from an officer with the White County Sheriff's office shows that he served a subpoena on Doherty "by telephone," explained the subpoena to her, and told her the court date. Doherty reasons that she was never personally served, and thus the trial court never obtained personal jurisdiction over her.

 Again, we reiterate that this was a criminal contempt proceeding to which the service provisions of the rules of civil procedure do not apply. We also reject Doherty's intimation that this situation is governed by the rule governing service of a criminal summons, Ark. R. Crim. P. 6.3. Instead, the governing provision is Ark. Code Ann. § 16-10-108, which sets forth the court's power to punish for criminal contempt and provides in part that "the party charged shall be notified of the accusation and shall have a reasonable time to make his defense." Moreover, the Due Process Clause requires that an alleged contemnor be given notice

of the charge of contempt pending against him and be informed of the specific nature of the charge. *See Fitzhugh v. State, supra.*

Under the particular facts of this case, we hold that Doherty had notice of the accusation that otherwise comported with the requirements of section 16-10-108 and due process of law. She was personally served with the first show-cause order for the hearing on November 21. Although this order did not describe the offense or the order that was violated, Doherty was present at that hearing where the contempt matter was discussed. Additionally, she was informed by telephone of the date of the December 11 show-cause hearing. Given these facts, Doherty obviously had actual notice of the offense and a reasonable time to prepare her defense.

### B. Judicial bias.

Doherty asserts a similar argument as DHS (she apparently joined in DHS's motion to amend judgment filed below) and alleges that bias on the part of the trial court necessitates that the contempt order be set aside. For the same reasons expressed as to DHS above, we affirm the trial court here.

### IV. The contempt sentence.

Finally, we take note of Doherty's sentence. We have recognized that the principal justification for contempt lies in the need for upholding public confidence in the majesty of the law and in the integrity of the judicial system and "when we have found these ends will be met despite a reduction or even a remission of a jail sentence for contempt it has been our practice to modify the judgment." *Carle v. Burnett,* 311 Ark. 477, 845 S.W.2d 7 (1993) (quoting *Garner and Rosen v. Amsler,* 238 Ark. 34, 377 S.W.2d 872 (1964)); *see also Page v. State,* 266 Ark. 398, 583 S.W.2d 70 (1979); *Dennison v. Mobley,* 257 Ark. 216, 515 S.W.2d 215 (1974). Given the circumstances of this case, in which Doherty's authority as area manager for DHS was limited to implementation of DHS policy set by senior officials at DHS, some of whom were served with the December 4 show-cause order but did not appear at the December 11 hearing, we are con-

vinced that the ends of justice do not require that Doherty be confined to jail for the length of time imposed by the trial court. Accordingly, we remit the jail sentence to two days to reflect Doherty's shared culpability in the matter.

Affirmed as modified.

GLAZE, J., concurring.

ARNOLD, C.J., BROWN and THORNTON, JJ., concurring in part; dissenting in part.

TOM GLAZE, Justice, concurring. I agree with the majority opinion, but write to mention what it further suggests, but does not say. First, it must be emphasized that the trial court in this matter had little other choice than to exercise its power of contempt when a person willfully refused to comply with the court's order directing the person to comply with the law. Here, Doherty, as an area manager of DHS, countermanded the trial court's order by telling case worker Heather Harper not to pay the family's utilities even though DHS had sufficient funds to pay the utilities.[1] While the trial court was within its power to use its criminal contempt authority to punish Doherty for her disobedience of the court's order, I think it would have been more appropriate in these circumstances to have compelled Doherty's and DHS's compliance through the trial court's *civil* contempt power — which brings me to the real point of this concurrence.[2]

While Doherty certainly was a party to the willful disobedience of the trial court's order, the then-DHS Director, Tom Dalton, and three other officials had been ordered to show cause why they should not be found in contempt as well. None of these

---

[1] The case worker and Doherty apparently were following department policy in declining to use budgeted cash assistance funds to pay the family's utilities. The case worker, though, tried to obtain monies from other independent sources, but failed.

[2] Civil contempt would have availed Doherty the opportunity to comply with the court's order or present evidence, if any, why she could not comply with court directives, e.g., whether she was ordered by supervisors not to pay cash assistance. The dissent incorrectly suggests Doherty was acting under fixed agency policy which she had no authority to supersede. If this were true, Doherty should have presented it in her defense. She did not, and this court is in no position to surmise on whether or not she was compelled to follow a DHS policy that contravened the trial court's order.

officials appeared, although they were personally served. Unfortunately, by the trial court's failure to compel these officials' appearance, the trial court sent the mixed signal that only subordinates, and not high-ranking officials, are answerable for department

In my view, the three ranking DHS officials who were served with a show-cause order should have been made to appear and explain why they adhered to a policy that contravened the court's directives. Because these officials appear to have shared in DHS's willful refusal to abide by the trial court's order, it is only fair that Doherty not be saddled with the entire brunt of the punishment. Therefore, I agree with the majority's substantial remittance of the sentence rendered in this case.

ROBERT L. BROWN, Justice, concurring in part; dissenting in part. I agree with the majority opinion except for the contempt sanction imposed. The majority affirms sending a mid-level bureaucrat to jail for following DHS policy which conflicted with the trial court's order. I cannot agree with putting Sandi Doherty in jail under these circumstances. For that reason, I dissent.

This is the first time, according to my research, that this court has jailed an agency employee who was acting under fixed agency policy which she had no authority to supersede. And while I heartily agree that court orders cannot be flouted and must be obeyed subject to sanctions, I seriously question whether the trial court and this court are punishing the right person. Indeed, this whole affair suggests that Ms. Doherty has been made the scapegoat.

DHS policy limited cash assistance paid by the department to cases of child abuse or neglect — children who were "at risk." Initially, R.P.'s situation fell into neither category. Ms. Doherty did not adopt the policy, but she unquestionably was placed on the horns of a dilemma. Either she followed agency policy or the trial court's directive to "provide" for the water and electricity. She testified that she believed she was complying with the court's order by garnering charitable aid from community providers to meet R.P.'s needs. The trial court perceived this to be in direct violation of the original order, and she was sanctioned with 53 days to serve in jail.

My only grievance with the outcome goes to the severity of the sanction under these facts. In *Arkansas Dept. of Human Servs. v. Clark*, 305 Ark. 561, 810 S.W.2d 331 (1991), we merely fined "DHS" $250 for the failure of a DHS employee to follow court orders regarding cash assistance for bus fares. Now, we make the quantum leap of jailing a DHS underling who implemented the offending policy and had no authority to contravene it.

In my judgment, the trial court should have followed through on its initial instincts and brought the policymakers of DHS into court, including the Director, who at the time was Tom Dalton. The trial court issued a show-cause order for senior officials on December 4, 1996, but failed to follow up on it. Only the director and perhaps one or two others could overrule fixed policy. Ms. Doherty could not.

Here, it appears that we are jailing a lieutenant for a general's offense. The majority, no doubt, has similar qualms, and that is why the jail time for Ms. Doherty has been remitted from 53 days to 2 days. Even with 2 days the stigma and humiliation of being jailed attaches. I think this new get-tough policy toward DHS functionaries could have been enforced just as well by assessing a meaningful fine against her or, indeed, against DHS itself.

For these reasons, I dissent from that part of the majority opinion sentencing Ms. Doherty to jail.

ARNOLD, C.J., and THORNTON, J., join.