ARKANSAS DEPARTMENT of HUMAN SERVICES
*v.* T.B., *et al.*

01–654                                    67 S.W.3d 539

Supreme Court of Arkansas
Opinion delivered February 14, 2002

*Dana McClain*, for appellant.

*Stephen D. Ralph*, for appellees.

W.H. "DUB" ARNOLD, Chief Justice. Appellant Arkansas Department of Human Services ("DHS") appeals the order of the Faulkner County Circuit Court ordering it to pay $48,000 to the Brown Schools, located in Tulsa, Oklahoma, for treatment of a juvenile sex offender. On appeal, DHS raises several

arguments in support of its contention that it is not responsible for paying the Brown Schools. We hold that appellant's argument is without merit and affirm the order of the trial court.

T.B., a minor, was initially brought before the juvenile court as a delinquent facing a charge of terroristic threatening stemming from an incident at Greenbrier Middle School. Upon the recommendation of DHS, the matter was changed from one of delinquency to one of family in need of services ("FINS"). Regular review hearings were held, and both T.B. and his parents underwent court-ordered counseling for an extended period of time.

On March 10, 2000, it was discovered that T.B. had sexually assaulted his three-year-old brother. At a hearing held on March 27, 2000, the juvenile court ordered that an Adolescent Sexual Adjustment Program ("ASAP") evaluation be performed on T.B. and that DHS try to find a suitable long-term placement facility for T.B. The ASAP evaluation was conducted by Jayne Barkus of Community Service, Inc. Based upon her evaluation of T.B., Barkus recommended that he be placed in a long-term residential behavioral modification program that offers specific treatment for sex offenders. She specifically noted that T.B. expressed a fear of hurting his brother in the future if he did not get help.

At the next review hearing held on May 1, 2000, Laura Strope, a DHS employee, testified that she was contacting facilities in an attempt to place T.B. but had been unsuccessful thus far. At the conclusion of the hearing, the trial court decided to take a seventy-two-hour hold of T.B. and ordered DHS to find suitable placement for him immediately.

A hearing was then held on May 4, 2000, and at that time various DHS employees again testified that there were no in-state residential treatment facilities willing to accept T.B. According to Strope and Andi McNeil, a FINS officer, either the facilities were already full, did not treat sex offenders, or did not accept patients of T.B.'s age. It was revealed during this hearing that if DHS kept T.B. in its physical custody without having a placement for him, he would have been forced to sleep on a cot in the local DHS office, with no access to a shower or food. The State then notified the court that T.B.'s parents were willing to take him home until the following Monday, so that DHS could continue to search for a placement. Strope further alerted the court that she had discussed the plans to keep T.B. separated from his younger brother with his parents and agreed that it was the best option.

The court continued the matter until May 8, 2000, when numerous officials who had denied placement to T.B. were subpoenaed to testify as to why placement was denied. Rebecca Dixon, a care manager with Arkansas Behavioral Care ("ABC"), testified that ABC had a contract with DHS to locate and facilitate placements for children referred to them by DHS. According to Dixon, ABC would pay to place a child in an out-of-state facility, but could not authorize such placement without approval from the Department of Children and Family Services ("DCFS"), a division within DHS. Specifically, Dixon stated that DCFS employee Evelyn Block had to approve any out-of-state placement. Dixon stated that she had been working with T.B.'s case manager to place him in a residential treatment facility, but had yet to find one that would accept him. Dixon then testified that she notified Strope to consider an out-of-state placement.

Sandra Carter, a DCFS employee in Faulkner County, testified that when a situation arises where a child cannot be placed in an in-state facility, the protocol is to call the Child Case Review Committee to seek approval to place the child in an out-of-state facility. It was Carter's understanding, as well as Strope's, that the Committee required written denials from all in-state facilities before considering out-of-state placement.

During a recess in this hearing, the parties met privately and discussed available options for T.B. When the hearing resumed, Teri Swicegood, the local attorney for DHS, notified the court that she believed a solution had been reached, and asked the court to allow Ms. McFarland, attorney for ABC, to address the court. Thereupon, McFarland recommended that T.B. be returned to the custody of his parents for the purpose of removing any impediments to out-of-state placement. According to McFarland, ABC would then be required to place T.B. in a facility within twenty-four hours. Swicegood then requested that the court remove T.B. from DHS's custody and return custody to his parents. The court agreed and ordered the parents to place him in a residential treatment facility within twenty-four hours. T.B. was subsequently placed in the Brown Schools.

T.B. initially made little to no progress at the Brown Schools. Reports from his therapist indicated that he refused to participate in group therapy, provoked the other children, and showed no remorse. After some time, however, T.B. began to exhibit slow signs of progress. About the time T.B. began to improve, officials at the Brown Schools were notified that Medicaid would no longer

cover the cost of T.B.'s treatment. An appeal of that decision was also summarily denied. A letter written on "Arkansas Department of Human Services, Medical Services Division" letterhead and dated November 22, 2000, stated that further coverage was being denied because T.B. did not meet certain Medicaid criteria. According to this letter, T.B. was not making any improvement and, thus, his treatment was not "medically necessary." Although this letter was on DHS letterhead, it was signed by Shirley Wilson, an employee of First Mental Health. First Mental Health, a Tennessee corporation, was the contractor hired by DHS to review their Medicaid claims after its previous contractor, ABC, went out of business.

The court was notified that Medicaid was no longer covering the cost of T.B.'s treatment during a review hearing held on September 18, 2000. Jennifer Wunstel, a supervisor with DCFS, testified that she had been in contact with the Brown Schools, and was aware that they were going to appeal the decision to First Mental Health. The DHS case plan filed with the court recommended that T.B. continue with his current treatment at the Brown Schools. After all parties, including counsel for DHS, agreed that it was in T.B.'s best interest to remain at Brown Schools and continue his treatment, the court ordered that T.B. remain at the Brown Schools.

During the next review hearing held on January 16, 2001, Wunstel indicated that DHS was attempting to work with First Mental Health to obtain recertification for T.B., but had yet been unsuccessful. The court was notified that an attempt to subpoena Wilson had failed, because she simply refused to travel from Tennessee to Arkansas to appear in court. In an effort to determine who was going to be responsible for paying the $48,000 debt owed to the Brown Schools, the attorneys and the court began discussing the nature of First Mental Health as a contractor for DHS. The issue of whether T.B.'s decertification was tied to the closing of the FINS case also arose. Discussions also centered on the possibility that decertification was somehow linked to the change in DHS's contractors. The following colloquy is illustrative:

> THE COURT: Well, and — and what is the Court's jurisdiction as to ordering the State of Arkansas to pay this bill?

> MS. SWICEGOOD: Well —

> THE COURT: Even if it has to go through the Claims Commission?

MS. SWICEGOOD: Well, Your Honor, the — of course, that would probably be something that would be — your could order it but we'd probably have to appeal it because it has to be a funding thing. And I'm not even sure — since I haven't seen the initial contract and I don't know who's responsible, I don't know that we have exhausted everything —

THE COURT: All the administrative remedies?

MS. SWICEGOOD: Yeah.

MS. SCROGGINS: Your Honor, if the Court ordered the Department of Human Services to pay the bill and that order hit the Department, I would think the Department would say, "First Mental Health, you need to do this because we're not."

. . . .

THE COURT: Well, what I'm — I'm just looking — trying to look at the big picture as to how to actually get to the goal that we all want which is for this child to continue to receive the treatment that he needs and is responding to, finally.

MS. SCROGGINS: Your Honor, if the Court could order the Department to pay the bill or, in the alternative, get the Department to get First Mental Health to approve the treatment, because, that way, it would put the Department administrative personnel — and I don't think this — I'm not directing it locally at the people here because I think they've probably done everything that they could do in that regard, but I think that would get the higher-ups at the Department of Human Services on the band wagon to get somebody looking into why this has been denied. And, if they're not going to pay it and First Mental Health is not going to pay it, have the order require the Department to get those people here.

A written order requiring DHS to pay the $48,000 was filed on January 30, 2001. A motion to reconsider was subsequently filed on February 9, 2001, wherein DHS raised several allegations of error with regard to the juvenile court's order; the court denied the motion for reconsideration.

On appeal, appellant DHS asserts that the trial court erred when it ordered DHS to pay the Brown Schools $48,000 for treatment of a child that DHS had neither custody nor control over, and where out-of-state placement was made in violation of Ark.

Code Ann. § 20-46-106 (Supp. 2001), Emotionally disturbed youth treated out of state, and Ark. Code Ann. § 9-27-332(10)(b) (Supp. 1999). Specifically, appellant contends that the trial court erred in the following ways:

1) The trial court cannot order specific placement of a child when ordering family services;

2) The DHS is not a party to the contract formed between T.B.'s parents and the Brown Schools, and, as such, cannot be held liable as an innocent third party for payment;

3) The trial court violated State sovereign immunity when it ordered DHS to pay the Brown Schools $48,000 or make the "responsible party" pay;

4) The trial court's order violated the doctrine of separation of powers.

We disagree that the trial court erred in any of these regards and affirm.

*I. Specific Placement*

■■ Under Ark. Code Ann. § 9-27-332(1)(A) (Supp. 1999), the juvenile court may order family services for a family that it finds to be a "family in need of services" (FINS). Family services are defined as "relevant services, including, but not limited to: child care; homemaker services; crisis counseling; cash assistance; transportation; family therapy; physical, psychiatric, or psychological evaluation; counseling; or treatment, provided to a juvenile or his family." Ark. Code Ann. § 9-27-303(23)(A) (Supp. 1999). The trial court has the power to order family services. However, what the trial court may *not* do is order or specify a *particular provider* for placement or family services. Ark. Code Ann. § 9-27-332(10)(b).

Appellant mistakenly contends that the trial court in this case ordered appellee juvenile to a specific facility, that being the Brown Schools, when, in fact, the trial court simply ordered him to "a residential treatment facility" and ordered that ABC would locate a placement. No in-state facilities were available, and after custody was returned to T.B.'s parents in order to find an out-of-state facility, and his parents placed him in the Brown Schools upon ABC's recommendation, the trial court simply ordered that he

*remain* there after subsequent status hearings. As pointed out in the facts, stated above, DHS even recommended that T.B. remain at the Brown Schools in its report to the court, dated January 16, 2001, *after* Medicaid benefits had been denied.

■ We hold that the court did not order placement in a specifically-named facility but rather ordered T.B. to "a residential treatment facility"; as such, the court committed no error in this regard.

## II. Contract between Juvenile's Parents and Brown Schools

DHS maintains that it is not a party to the contract formed between T.B.'s parents and the Brown Schools, and as such cannot be held liable as an innocent third party for payment. We find no merit in appellant's argument. First, DHS is obligated by statute to provide services to T.B.; included in those "services" is treatment in a residential facility if the court determines treatment is necessary, which the court *did* in this case. DHS attempts to argue here that it had nothing to do with the decision to place T.B. at the Tulsa facility. Not only is such an assertion misleading, but it also ignores DHS's obligation to provide services for children of this state. DHS participated actively in this case from the beginning. Even after custody was returned to the parents, DHS maintained a protective services case. Strope, the case worker, continued to file reports with the court, and the court continued to hold regularly scheduled review hearings. In fact, the case plans filed by Strope with the court continuously recommended that T.B. remain at the Brown Schools until he successfully completed the treatment program. This was true even after DHS had notice that Medicaid was no longer covering the cost of T.B.'s treatment. In sum, just because DHS did not have custody of T.B., does not mean that they were likewise not obligated to provide necessary services. T.B.'s family may have had the "contract" with the Brown Schools, but it was only because custody had to be in their name, rather than DHS's, in order for the out-of-state facility to be considered. If an Arkansas facility would have been available, T.B. would have received treatment in-state, and DHS would have paid for the services.

■ Clearly, because a protective services case was open on T.B., DHS was obligated to provide the services ordered by the trial court. Initially, the trial court ordered DHS to find a residential treatment facility for T.B.. When there were no in-state facilities

available, DHS agreed to placing T.B. in an out-of-state facility. DHS specifically asked the juvenile court to consider such an option and then requested that the juvenile court return custody to the parents in order to facilitate the out-of-state placement. The fact that DHS did not have custody of T.B. is irrelevant in determining whether DHS is responsible for paying the cost of the child's treatment.

### III. Sovereign Immunity

■ DHS contends that the trial court violated State sovereign immunity when it ordered DHS to pay the Brown Schools $48,000 or make the "responsible party" pay. Article 5, § 20, of the Arkansas Constitution provides that "[t]he State of Arkansas shall never be made a defendant in any of her courts." Suits against the State are expressly forbidden by this provision. DHS is a State agency, and it maintains that when the trial court ordered it to pay the Brown Schools bill, it made DHS a defendant and, thus, violated the Sovereign Immunity clause of the Arkansas Constitution. We disagree.

■ This Court has addressed this issue before, and we have recognized an exception to the doctrine of sovereign immunity where an act of the legislature has created a specific waiver of immunity. *See Arkansas Dep't of Human Services v. R.P.*, 333 Ark 516, 970 S.W.2d 225 (1998); *Arkansas Office of Child Support Enforcement v. Mitchell*, 330 Ark. 338, 954 S.W.2d 907 (1997); *State v. Tedder*, 326 Ark. 495, 932 S.W.2d 755 (1996). The Juvenile Code expressly empowers the court to order cash assistance in FINS cases. When a family is found to be in need of services, the court may order "family services." Ark. Code Ann. § 9-27-332 (Supp. 1999). The following are included within the definition of "family services":

(A) "Family services" means relevant services, including, but not limited to:

(i) Child care;

(ii) Homemaker services;

(iii) Crisis counseling;

(iv) *Cash assistance*;

(v) Transportation;

(vi) Family therapy;

(vii) Physical, psychiatric, or psychological evaluation;

(viii) Counseling; or

(ix) *Treatment, provided to a juvenile or his family.*

(B) Family services are provided in order to:

(i) Prevent a juvenile from being removed from a parent, guardian, or custodian;

(ii) Reunite the juvenile with the parent, guardian, or custodian from whom the juvenile has been removed; or

(iii) Implement a permanent plan of adoption, guardianship, or rehabilitation of the juvenile.

Ark. Code Ann. § 9-27-303(23) (emphasis added). A FINS petition may be initiated by any adult. Ark. Code Ann. § 9-27-310(b)(3)(A) (Supp. 1999). Before a juvenile may be removed from a parent, the court is required to order family services appropriate to prevent removal. Ark. Code Ann. § 9-27-328(a) (Supp. 1999).

■ We concluded in *R.P., supra,* that given that the trial court is empowered to order family services in FINS cases to prevent a juvenile from being removed from a parent, which by definition includes cash assistance, the General Assembly has specifically waived sovereign immunity as to DHS in such instances. Any other interpretation would effectively eviscerate the court's power to order family services in FINS cases. This is especially true considering that a FINS case may be initiated by "any adult," where DHS will not be the initial moving party. Such a consequence could not have been intended by the General Assembly in enacting the Juvenile Code.

■■ DHS maintains that it is not its policy to provide financial assistance for out-of-state treatment; however, with regard to the contention that the trial court's order does not comport with its policy, this Court has previously held that the juvenile court's orders do not have to comply with DHS policy. *See Arkansas Dep't of Human Servs. v. Clark,* 304 Ark. 403, 802 S.W.2d 461 (1991). In

short, this Court has conclusively held that the legislature has "waived" immunity by empowering the court to provide family services; therefore we affirm on the issue of sovereign immunity.

*IV. Separation-of-Powers Doctrine*

DHS contends that by requiring it to pay a debt to the Brown Schools, the trial court has in effect adjudged DHS to be a party to a contract with the Brown Schools. Appellant maintains that this violates the separation-of-powers doctrine. DHS argues that by ordering the parents to place T.B. at the Brown Schools, without following the guidelines set forth under Ark. Code Ann. § 20-46-106 "Emotionally disturbed youth treated out of state," the juvenile court in effect chose a particular provider (the Brown Schools) and usurped the authority given to DHS by the General Assembly. This argument is without merit.

First, as addressed above in subsection I., the court did not order T.B.'s parents to place him at the Brown Schools. The court simply ordered that he be placed in a residential treatment facility. Moreover, in regard to § 20-46-106 and appellant's contention that the court failed to follow the guidelines set out therein, appellant concedes in its reply brief that it is DHS's responsibility (not the court's) to make the determinations outlined in § 20-46-106 and that said determinations, *although made*, were not *explicitly docu-mented* due to time constraints. The trial court was eager to proceed immediately with finding a treatment facility for T.B., and it was clear that no in-state facilities were available.

It is true that subsection (a)(2) of Ark. Code Ann. § 20-46-106 (Supp. 2001) requires DHS to make "and document" certain deter-minations established in subsection (b) of this section and that if an out-of-state placement is made without documenting such deter-minations, payment for services shall not be authorized. However, as stated above, DHS admitted that the determinations were, in fact, made and that it was DHS's responsibility to document the deter-minations. The fact that the court was eager to proceed immedi-ately in no way absolved DHS of its responsibility under § 20-46-106 to document the determinations that it had already admittedly made in order that T.B. might be placed in an appropriate facility, albeit out of state.

We hold that DHS cannot refuse to pay for services simply because documentation was not specifically made, although

determinations *were* made, pursuant to § 20-46-106, when it is DHS's duty, itself, to document the determinations referred to in that section. Furthermore, the purpose of § 20-46-106 is to ensure that, whenever possible, children in Arkansas receive treatment in Arkansas; this was clearly not going to happen in this case, as no facilities were available at that time in Arkansas.

For all of the forgoing reasons, we affirm the case.

Affirmed.

BROWN, IMBER, and THORNTON, JJ., dissent.

RAY THORNTON, Justice. I respectfully dissent on the issue of whether DHS is immune from this lawsuit under the protection of the doctrine of sovereign immunity. As a state agency, DHS is afforded the protection of sovereign immunity, a defense that arises from Article 5, Section 20, of the Arkansas Constitution, which provides: "The State of Arkansas shall never be made a defendant in any of her courts." Sovereign immunity may only be waived in limited circumstances, and this court has recognized only two ways that a claim of sovereign immunity may be defeated: (1) where the state is the moving party seeking specific relief; and (2) where an act of the legislature has created a specific waiver of immunity. *Short v. Westark Community College*, 347 Ark. 497, 65 S.W.3d 440 (2002); *State Office of Child Support Enforcem't v. Mitchell*, 330 Ark. 338, 954 S.W.2d 907 (1997). Furthermore, sovereign immunity is jurisdictional immunity from suit that may be waived by consent. *State v. Goss*, 344 Ark. 523, 42 S.W.3d 440 (2001). In the present case, neither exception applies. The trial court failed to recognize that the state did not waive sovereign immunity, nor did DHS consent. When the trial court ordered DHS to pay the Brown Schools's bill, it violated the doctrine of sovereign immunity.

The Juvenile Code gives the court the power to order DHS to provide funds for family services, but the legislature specifically limited waiver of the state's sovereign immunity with respect to any payment for out of state placement. Clear statutory language contained in Ark. Code Ann. § 20-46-106 subsections (a)(2) and (b)(1)—(10). Ark. Code Ann. § 20-46-106(a) provides as follows:

> (2) Prior to making an out-of-state placement, the Department of Humans Services shall make and document the determinations

established in subsection (b) of this section. *If an out of state placement is made without documenting such determinations, payment for services shall not be authorized.*

[Emphasis added.] In the case under consideration, the Department of Human Services did not make the required determinations. There was a complete failure to follow the mandatory directions required by Ark. Code Ann. § 20-46-106(b), which reads as follows:

Before an emotionally disturbed youth is placed in an out-of-state treatment facility, the Department of Human Services shall make and document the following determinations:

(1) Whether the emotionally disturbed youth has been appropriately and accurately diagnosed;

(2) Whether an appropriate treatment facility exists within the state;

(3) Whether there is an appropriate treatment facility in a border state;

(4) Whether the facility being considered has the most appropriate program.

(5) Whether the program requires payment of board, and if so, what is the amount;

(6) Whether the total cost for treatment in the out-of-state facility exceeds the cost for treatment in state;

(7) Where youth residing at the facility attend school, and whether the school is accredited;

(8) What type of professional staff is available at the facility;

(9) What mechanisms are in place to address problems that are not within the purview of the program;

(10) What other considerations exist, in addition to the youth's emotional problems, such as other medical conditions, travel expenses, wishes of the youth, best interests of the youth, effect of out-of-state placement on the youth, and proximity to the emotional disturbed youth's family; and

(11) What alternatives exist to out-of-state placement, and the benefits and detriments of each alternative.

The trial court entered its order without requiring DHS to make the statutorily required determinations, and the state's statutory waiver of sovereign immunity did not occur.

The matter of payment for out-of-state services obtained without complying with Ark. Code Ann. § 20-46-106 should be presented to the claims commission for determination.

Today's decision awards money damages against the state when there was a specific retention of sovereign immunity, and I respectfully dissent.

I am authorized to state that JJ. BROWN and IMBER join in this dissent.