Kenneth Scott ANDREWS *v.* STATE of Arkansas

CR 99-689 42 S.W.3d 484

Supreme Court of Arkansas
Opinion delivered May 3, 2001

608

*John W. Rife*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Todd L. Newton*, Ass't Att'y Gen., for appellee.

PER CURIAM. The appellant, Kenneth Scott Andrews, was convicted by a jury of first-degree murder and was sentenced to forty years in the Arkansas Department of Correction. We affirmed appellant's conviction and sentence in *Andrews v. State*, 305 Ark. 262, 807 S.W.2d 917 (1991). Appellant then appealed from an order denying his request for postconviction relief. We

reversed and remanded the case to the Circuit Court so written findings of fact and conclusions of law could be entered. The trial court complied with our request, and the case is back before us on review.

Appellant was convicted in 1990. At that time, Arkansas Criminal Procedure Rule 37 had been abolished and replaced with Rule 36.4. Under Rule 36.4, a criminal defendant who wished to raise a claim of ineffective assistance of counsel had to do so in a motion for a new trial within thirty days of the date of the judgment. Appellant did not file such a motion, but sought *habeas corpus* relief pursuant to 28 U.S.C. § 2254 in federal court. The federal district court issued a conditional writ of *habeas corpus* that provided that a writ would issue within 120 days unless appellant was permitted to proceed under Rule 36.4 in state court. Pursuant to the order of the federal court, appellant filed a motion for a new trial in which he alleged that he did not receive effective assistance of counsel as guaranteed by the Sixth Amendment. The trial court denied appellant's petition.

For his first point on appeal, appellant argues that counsel was ineffective for failing to preserve the sufficiency of the evidence for appellate review. We disagree.

The criteria for assessing the effectiveness of counsel were enunciated by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* provides that when a convicted defendant complains of ineffective assistance of counsel, he must show that counsel's representation fell below an objective standard of reasonableness and that counsel's deficient performance prejudiced his defense. Judicial review of counsel's performance must be highly deferential, and a fair assessment of counsel's performance under *Strickland* requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from counsel's perspective at the time. *Missildine v. State*, 314 Ark. 500, 863 S.W.2d 813 (1993). A reviewing court must indulge a strong presumption that the conduct falls within the wide range of reasonable professional assistance. *Id.*

To prevail on any claim of ineffective assistance of counsel, the petitioner must show first that counsel's performance was deficient. *Thomas v. State*, 322 Ark. 670, 911 S.W.2d 259 (1995). This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by

the Sixth Amendment. *Id.* Secondly, the petitioner must show that the deficient performance prejudiced the defense, which requires a showing that counsel's errors were so serious as to deprive the petitioner of a fair trial. *Id.* Unless a petitioner makes both showings, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *Id.* The petitioner must show that there is a reasonable probability that, but for counsel's errors, the factfinder would have had a reasonable doubt respecting guilt in that the decision reached would have been different absent the errors. *Id.*; *Huls v. State*, 301 Ark. 572, 785 S.W.2d 467 (1990). A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. 668; *Thomas*, 322 Ark. 670, 911 S.W.2d 259.

■■ Ineffective assistance of counsel cannot be established merely by showing that an error was made by counsel or by revealing that a failure to object prevented an issue from being addressed on appeal. *Huls*, 301 Ark. 572, 785 S.W.2d 467. In *Huls*, this court found that even if a timely objection at trial could have prevented the jury from hearing a witness's testimony, the testimony, when taken with the entire evidence presented at trial, did not lead to a conclusion that there was a reasonable probability that the jury would have acquitted petitioner if the witness had not testified. In making a determination on a claim of counsel's ineffectiveness, we must consider the totality of the evidence presented to the judge or jury. *Id.*

The record reveals that Danny Jordan, an accomplice to the murder, testified in great detail about the crime and the participation of appellant and appellant's father, Joe Kenneth Andrews (Joe). Jordan told of helping move a safe from a jewelry store to the home of the victim, James Robinson. He told Joe about the safe, and Joe expressed interest in stealing it. At one meeting where Joe, Jordan, and appellant were present, appellant announced that he would get the safe even if the others would not do it. On February 19, 1990, the three went to Dardanelle State Park in Joe's father's green and white pickup truck to observe Robinson's house. Jordan said they stayed there all afternoon and planned to steal the safe, which they would then bury in the Andrews' yard.

Jordan testified further that on the afternoon of February 20, he was at home visiting with his mother when Joe and appellant arrived in the green and white truck. When Jordan's mother left, at about 4:00 p.m., the three men drove to the park in the truck and watched Robinson's home. Around 5:30 p.m., a person hired by

Mr. Robinson to work around the house left. At that point, Joe, Jordan, and appellant decided to approach the victim's residence. Joe gave Jordan and appellant each a pair of white gloves to wear while taking the safe. They then drove to Robinson's home. Jordan stayed in the driveway with the truck while Joe and appellant went into a carport. Jordan then heard choking sounds. At that point, appellant waved to Jordan to come to the carport where Jordan saw Robinson lying atop an air conditioner.

Jordan said that when he and appellant attempted to enter a shop area to get the safe, they tripped a burglar alarm. As Jordan and appellant were running back to the truck, Jordan looked back and saw Joe with his hand on Robinson's chest, but he did not see a knife. Joe, who had blood on his hands, got in the truck and told Jordan and appellant that he had choked Robinson with a rope and stabbed him two or three times. They then drove to Delaware Park. Joe had the victim's wallet from which he gave Jordan $100.00, appellant $95.00, and he kept $95.00 for himself.

Appellant contends that there was not sufficient corroborating evidence to support this accomplice testimony, and thus, counsel was ineffective for failing to preserve the issue. Arkansas law requires that the corroborative evidence tend to connect the defendant with the commission of the crime. Ark. Code Ann. § 16-89-111 (1987). Corroboration is not sufficient, if it merely shows that the crime was committed and the circumstances of the crime. *Id.* We have held that the "corroboration must be sufficient standing alone to establish the commission of the offense and to connect the defendant with it." *Johnson v. State,* 303 Ark. 12, 17, 792 S.W.2d 863, 865 (1990); *David v. State,* 295 Ark. 131, 140, 748 S.W.2d 117, 122 (1988). The corroborative evidence must be substantial evidence that is stronger evidence than that which merely raises a suspicion of guilt. *Henderson v. State,* 279 Ark. 435, 652 S.W.2d 16 (1983). Circumstantial evidence qualifies as corroborating evidence but it, too, must be substantial. *See David v. State, supra.* However, corroboration need not be so substantial in and of itself to sustain a conviction. *See Rhodes v. State,* 280 Ark. 156, 655 S.W.2d 421 (1983); *Walker v. State,* 277 Ark. 137, 639 S.W.2d 742 (1982). The presence of an accused in the proximity of a crime, opportunity, and association with a person involved in a crime in a manner suggestive of joint participation, are relevant factors in determining the connection of an accomplice with the crime. *Ashley v. State,* 22 Ark. App. 73, 732 S.W.2d 872 (1987). When two or more persons assist each other in the commission of a crime, each is an accomplice and criminally liable, ultimately, for his own

conduct, but he cannot disclaim responsibility because he did not personally take part in every act that went to make up the crime as a whole. *Phillips v. State*, 17 Ark. App. 86, 703 S.W.2d 471 (1986).

In reviewing this issue, we eliminate the testimony given by Jordan, and we examine whether what remains of the State's evidence independently establishes the crime and tends to connect appellant with its commission.

Danny Jordan's mother, Wilma Jordan, testified that Danny Jordan and Joe Andrews were good friends. She was at Danny Jordan's home on the afternoon of February 20, when Joe and Scott Andrews pulled up in a green pickup truck. She left them there together at around 3:45 or 4:00 that afternoon.

James Warren testified that, on February 20, at 5:30 p.m., he saw three men in the park where he was jogging. The three were looking south toward Robinson's home. He also saw a green pickup truck near the men.

Sandra Rackley testified she saw her brother, Danny Jordan, and Joe Andrews together at 8:00 p.m. on February 20.

Carrie Payton testified that Scott Andrews came to the Gum Log area, on February 20, between 5:30 and 6:00 p.m., where her mother's and her grandmother's homes were. On cross-examination, she stated it could have been 6:30 or 7:00 p.m. as she had said in an earlier statement to the police. She testified Scott told her he had almost $100.00. He offered to give her $5.00, and the following day he brought her a bottle of champagne, a dozen roses in separate vases, and a stuffed animal.

Carrie Payton's mother testified that, in addition to the items Carrie mentioned, Scott brought Carrie a small "promise ring" with a diamond in it.

Jean Andrews, wife of Joe, testified that appellant was unemployed and had been since November. Another witness testified that appellant had done odd jobs for her but that she had paid him no more than $50.00 the week prior to February 20.

Police officers testified that they arrested Scott on suspicion of having killed Robinson. When arrested, appellant was at an outdoor "beer party" where people under age were drinking. When the officers began looking through the crowd for appellant, he

attempted to move toward the edge of the group, and when they approached him, he began to run but was tackled after taking about six strides. He was given a Miranda warning, told of the charges against him and placed in the officers' car. One officer asked the other if Carrie Payton was at the party, and appellant volunteered a statement that she was not involved in "this mess" and there was no reason for her to be.

Officers found a hole that had been recently dug in the backyard of the Andrew's residence. Also, officers recovered the victim's wallet in Paris where Jordan said that they had left it.

Here, the only issue raised by appellant with regard to corroboration focuses on appellant's connection with the murder of Mr. Robinson. When viewing the evidence submitted and excluding Jordan's testimony, the evidence tends to connect appellant with the murder of Mr. Robinson. Witnesses placed appellant with Jordan and Joe hours before the murder. Ms. Wilma Jordan also established that appellant and Joe were in a green pickup truck the day of the murder when they came to Jordan's residence. Mr. Warren viewed three men standing next to a green pickup truck at Dardanelle State Park, looking in the direction of the victim's home on the day of the murder. Appellant was also seen with Jordan and Joe at 8:00 p.m. that same evening. Carrie Payton established that appellant had $100.00 in cash the night of the crime, whereas, other evidence revealed that appellant had been unemployed for several months. Finally, appellant made a statement to police after he had been arrested and advised of the charges against him that Carrie Payton was not involved in "this mess". The officers also observed a recently dug hole in the backyard of the Andrew's residence and the victim's wallet was recovered in Paris.

The Rule 37 trial court found that there was ample corroborative evidence tending to connect appellant with the commission of the crime and that there was not a reasonable probability that, but for counsel's error, the result would have been different. The court concluded that appellant had failed to demonstrate any prejudice resulting from the alleged deficiency of his trial counsel. Under our standard of review and the evidence before us, we cannot say that the trial court's decision is clearly erroneous.

For his second point on appeal, appellant argues that counsel was ineffective for failing to object to extrajudicial statements by a nontestifying co-defendant that implicated appellant. Appellant

cites to *Bruton v. United States*, 391 U.S. 123 (1969), in support of his argument.

Prior to appellant's trial, counsel filed a motion requesting that appellant's trial be severed from his father's trial. A hearing was held, and the court denied the request after it was determined that a conspiracy did not exist between appellant and his father, Joe, and that there was not a *Bruton* issue involved. At that time, it was agreed that the only incriminating statements that were involved would come from Jordan and not Joe, appellant's co-defendant. However, during Jordan's direct examination at appellant's trial, Jordan testified that Joe told him that appellant had dug a hole on the Andrews' property to be used as a "grave" for the safe they were going to steal from Mr. Robinson. Jordan also testified that while he was visiting Joe at the Andrews' property the morning of the murder, Joe said that "Scottie was out digging the grave." Finally, Jordan testified that on the night of February 20, after the murder, Joe said that "Scottie told me to cut his throat, but I didn't do it, I swear I didn't do it." On cross-examination, Jordan said that Joe told him that "Scottie told me to cut his throat." Counsel never objected to any of the above statements.

 ██ In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that a defendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment is denied by the admission of incriminating statements made by a co-defendant. Assuming that the above statements admitted through Jordan fall within the category of statements covered by *Bruton*, counsel's failure to object would have denied appellant effective assistance of counsel. However, at the Rule 37 hearing, trial counsel testified with regard to this issue:

> A. Now, the reason, you say, why wasn't a mistrial made or something like that. It's — you will remember that Scottie and I were trying to do two things. We were really trying to do one thing. We were trying to remove us from Delaware, the murder scene, and put us over where Carrie was, okay? To do that I needed to attack Jordan. And he gave me — when he said that, he gave me a piece of ammunition that I could use in cross-examination. If you can read the cross-examination you can see that it cast great doubt on anything Jordan says as it relates to Scottie because I had an inconsistency. Now, do you as a Defense counsel want an inconsistent statement, or do you want a continuance?
>
> Q. I have — I —

A. You know I wanted an inconsistent statement and I had it.

...

Q. So, the only way to cross that — examine that is to put either of the two Defendants on the stand.

A. No. You use his [Jordan] own statement. Because, see, he had made a statement to Short. And Short had come in and narrowed it — cross-examination is in the record. You'll see that Short had asked him a specific question about that. And the guy had answered conclusively and completely, "No, nothing else was said." And you got that and the guy on the stand, and you're feeling good now.

Trial counsel's explanation of the tactical reason why he did not move for a mistrial or raise a *Bruton* issue at that point in the trial was not outside the range of professionally competent assistance.

Despite our finding that counsel was not ineffective for his tactical decision, appellant's challenge would still fail because he has not satisfied the second prong of *Strickland*, that is, but for trial counsel's deficient performance, the likely outcome of the trial would have been different.

In reviewing the evidence under the second prong of *Strickland*, we note that the Supreme Court has explained that a violation of the *Bruton* rule may be harmless error if there is over-whelming evidence of the defendant's guilt. *See Harrington v. California*, 395 U.S. 250, 253, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (explaining that the case against the defendant "was so overwhelming that we conclude this violation of *Bruton* was harmless beyond a reasonable doubt"). "In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the code-fendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." *Schneble v. Florida*, 405 U.S. 427, 430, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

In *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court set forth the factors for determining whether a violation of the Confrontation Clause was harmless error. *See id.* at 684, 106 S.Ct. 1431. The Court explained as follows:

Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. *Cf. Harrington*, 395 U.S., at 254; *Schneble v. Florida*, 405 U.S., at 432.

■ As noted in our disposition of appellant's first issue in this appeal, there was ample evidence to corroborate Jordan's testimony supporting appellant's conviction. Excluding those statements at issue here, the evidence indicates that appellant was with Jordan and Joe hours before the murder, appellant was at the victim's home at the time of the murder, Joe Andrews choked and stabbed the victim, Joe stole the victim's wallet and distributed $95.00 to appellant, appellant was seen with approximately $100.00 in his possession immediately after the murder, appellant tried to flee when the police approached him at a party, and after he was placed under arrest, appellant stated that Carrie Payton was not involved in "this mess." Because the evidence against appellant in this case was so strong, counsel's failure to object to the statements was harmless. Thus, the likely outcome of the trial would not have been different, and the trial court's finding that appellant had failed to demonstrate prejudice from his attorney's alleged deficiency is affirmed.

For his last assignment of error, appellant argues that he should be given a new trial because the State had exculpatory evidence that would have exonerated appellant. The State responds that this issue is not cognizable under Rule 36.4. Even if the State's position may have validity, we find that appellant's point is without merit.

Appellant contends that Margie Jones had exculpatory testimony that appellant was not one of the two men she observed parked looking in the direction of the victim's home on the day of the murder. He argues that the police, specifically Dan Short, were aware of this information and did not provide it to defense counsel.

At the Rule 37 hearing, appellant called Ms. Jones to the stand where she testified that a friend of appellant's had contacted her approximately four years after appellant's trial because this friend had heard that Ms. Jones may have seen something the day of the murder. She told this person that a police officer came to her home in 1990 to ask her some questions, and she told the officer what she

had seen regarding the two men in a green truck. During her Rule 37 testimony, Ms. Jones admitted that she could not recall the officers name, and she could not be positive if Dan Short was the officer. In fact, the record indicates that Ms. Jones was not positive if a police officer was the one who came to her home in 1990:

> No, it was a friend of Scott's that called me at first, somebody that was trying — or maybe he was a police. I don't really know. I didn't ask him. He asked me if he could talk to me about it, that's all, what I saw. And he come to the house and he come in. Now, this is seven years ago and I've lost two kids since then of my own.

* * *

> So, my memory is not real good on what his name was because I didn't think it was significant at the time, really.

▋ The Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* In *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936, 144 L. Ed. 2d 286, (1999) the Court revisited *Brady* and explained its implications. It noted:

> We have since [the decision in *Brady*] held that the duty to disclose such evidence is applicable even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence. Such evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. "Moreover, the rule encompasses evidence" known only to police investigators and not to the prosecutor." In order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police."

*Strickler, supra.* (internal citations omitted). The Court, in *Strickler*, also outlined the three elements of a true *Brady* violation. These components include:

> (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that

evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued.

*Strickler, supra.*

Applying this analysis to the case before us, we hold that the trial court correctly determined that there was no showing of prosecutorial misconduct or that the outcome of the trial would have been different had the testimony been presented. Officer Dan Short testified at the Rule 37 hearing that he did not recall speaking with Ms. Jones and that there were no notes or papers in the police file indicating that he had spoken to Ms. Jones in 1990. After reviewing this record, there is no credible evidence that the state suppressed Ms. Jones's alleged statements in 1990. In fact, there is no credible evidence that the state was ever aware or in possession of such evidence. Thus, we cannot say that the Rule 37 trial court's decision that there was no showing of prosecutorial misconduct and that the outcome of the trial would not have been affected by the Ms. Jones's testimony is clearly erroneous.

Affirmed.