Samuel A. PERRONI *v.* STATE of Arkansas

03-878                                    186 S.W.3d 206

Supreme Court of Arkansas
Opinion delivered June 17, 2004

[Rehearing denied September 9, 2004.*]

---

* BROWN, IMBER, and THORNTON, JJ., would grant rehearing.

*Dudley & Compton,* by: *Timothy O. Dudley,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Vada Berger,* Ass't Att'y Gen., for appellee.

Tom Glaze, Justice. Attorney Samuel A. Perroni appeals Circuit Judge Timothy D. Fox's order finding Perroni in

criminal contempt. This matter arises out of a felony tax fraud case that the State filed on July 1, 2000, in the Pulaski County Circuit Court, Sixth Division, against Richard Ross and two other defendants. Perroni represented Ross. Initially, Judge David Bogard was presiding judge, and there were five continuances granted, two of which were because of scheduling conflicts with cases Perroni had pending in different federal district courts.[1] Finally, the Ross matter was set first out for a four-day jury trial to begin on February 11, 2003. On August 5, 2002, both Perroni and Ross executed a notice order of the February 11 trial setting.

Meanwhile, Perroni undertook the representation of another defendant, Steve Pirani, who, along with two co-defendants, was charged in federal court with numerous felony offenses. Pirani was indicted on July 25, 2002, arraigned on August 7, 2002, and Federal District Judge Susan Webber Wright initially set the Pirani trial to begin on September 4, 2002. However, Perroni promptly asked Judge Wright for a continuance, asserting that he had another federal court case scheduled to commence on September 16, 2002, in Federal District Judge Bill Wilson's court. Judge Wright accommodated Perroni by rescheduling the Pirani case to begin on February 10, 2003. For unknown reasons, Perroni did not advise Judge Wright that the February 10 date would conflict with the earlier setting of February 11, 2003, in the state court's Ross case.

The next relevant date and event occurred when, on January 6, 2003, Judge Wright entered an order noting that she had previously denied Steve Pirani's motion to sever, but asked the Government to explain its objection to severance. In her order, Judge Wright reconfirmed the February 10, 2003, trial setting. Again, Perroni never mentioned this conflict with the state court's February 11, 2003, trial setting. By way of a telephone conference with all counsel for the Government and defendants, on January 31, 2003, Judge Wright noted in her order of the same date that she was advised that the defendants could be tried separately, and she

---

[1] Perroni related that he could not recall why the first continuance was granted, but the second one was because the state court severed charges against Ross and the two other co-defendants. The third and fourth continuances were because of two separate defendants Perroni represented in different federal district courts whose trial settings conflicted with a trial setting in the Ross case. He further said that the fifth continuance was granted because the Ross trial was preempted by a capital felony murder case.

directed that Steve Pirani's trial would commence with jury selection to begin on February 10, 2003, and Pirani's co-defendants would be tried afterwards. Again, the record reflects that Perroni failed to mention to Judge Wright the scheduling conflict he had regarding the Ross case in state court. Instead, Perroni waited until January 31, 2003, to ask the state circuit court judge for another continuance of the Ross case. At this stage of the proceedings in the Ross and Pirani cases, Circuit Judge Fox had been elected and replaced Judge Bogard, who had retired.

Judge Fox promptly set a hearing for February 4, 2003, to consider Perroni's motion for continuance, but, instead of appearing at the February 4 hearing, Perroni sent an associate. After Judge Fox denied the continuance Perroni's associate had requested, Perroni quickly moved for Judge Fox to reconsider his ruling; however, at another hearing set on February 5, 2003, Judge Fox refused to set aside his order denying a continuance. Perroni then moved to withdraw as Ross's counsel, and that request, too, was denied.

On February 10, 2003, Perroni had a letter delivered to Judge Fox, renewing his motions for continuance and to withdraw as counsel. He enclosed a copy of Judge Wright's scheduling order which reflected that Steve Pirani's trial was to begin February 10, 2003. On the day of trial, February 11, 2003, Ross appeared in court without counsel, although Perroni's law partner, Patrick James, appeared and advised that he was making a special appearance on Ross's behalf. The state prosecutor announced ready for trial, but the trial court continued the case and released the jury and the State's witnesses because Ross said that he had been unable to obtain substitute counsel. Citing Ark. Code Ann. § 16-84-111(b) (Supp. 2003),[2] Fox ordered Ross to be held in custody pending further orders of the court. Judge Fox stated the case was

---

[2] Ark. Code Ann. § 16-84-111(b) provides:

> [F]or a felony *when a defendant is upon bail, he may remain upon bail or be kept in actual custody as the court may direct. If the defendant remains on bail, any surety's liability shall be exonerated unless the surety has agreed to remain as the surety until final judgment is rendered.* (Emphasis added.)

Perroni's motion also mentioned that he had been the treasurer for attorney Leon Johnson who was Fox's past opponent and candidate for circuit judge — a race Johnson lost. Perroni's partner, James, asserted that Judge Fox's action of placing Ross in jail was some type of retaliation against Perroni.

in recess, and Ross could again be released upon an appearance bond, if the surety agreed to remain as the surety until final judgment was rendered.

On February 12, 2003, Judge Fox issued an order to show cause why Perroni should not be held in contempt for failing to appear in court to represent Ross on February 11, 2003. Perroni responded by filing a motion suggesting Judge Fox's disqualification, alleging Judge Fox's impartiality might be questioned. Perroni alleged that Fox improperly did the following:

> (1) Illegally and unconstitutionally incarcerated Ross in what appears to be retaliation against his counsel, Perroni.
>
> (2) Inappropriately, adversarially, and aggressively took action against Perroni via the court's correspondence, treatment of counsel, and the issuance of an order to show cause.
>
> (3) Independently investigated facts in this case as opposed to considering only the evidence presented. This included an investigation of Ross's appearance bond and the pleadings filed in the Pirani case.

Perroni concluded by stating that Judge Fox and his staff were in an adversarial relationship which suggested Fox's impartiality might reasonably be questioned. Perroni requested an evidentiary hearing regarding his allegations, and Judge Fox set a hearing on March 14, 2003.

On March 14, 2003, a hearing was held, and Perroni's attorney renewed his earlier motions which Judge Fox again denied. Fox then recited the facts of the case, and Perroni called Federal Judge Bill Wilson to testify as a character witness. After Judge Wilson's testimony, Judge Fox and Perroni's attorney, Tim Dudley, turned their attention to the fact that Perroni had filed a removal motion in federal district court, and no further action could be conducted until the federal court decided to take the case or remand it back to the state circuit court. The federal court returned this case to Judge Fox's court, whereupon Fox found that Perroni had wilfully disobeyed Fox's scheduling order by not appearing with Ross at the February 11, 2003, trial. Judge Fox imposed the following sanctions:

> (1) payment of $780.00 for reimbursement of the juror members who were called, had appeared, and were discharged in Ross's case;

(2)   payment of the State's witness fees in the amount of $443.72;

(3)   reimbursement of the costs of copying pleadings filed in the Pirani federal court case in the amount of $55.20; and

(4)   payment of a fine of $1,000.00.

Perroni brings this appeal contending that (1) Judge Fox committed reversible error by failing to recuse; (2) as a matter of law, there is a failure of evidence with regard to the charge of willful conduct; and (3) Judge Fox erred by failing to accord him his constitutional protections. In arguing his first point, Perroni offers six reasons that he believes merit reversal. He claims Judge Fox erred (1) by serving as a prosecutor; (2) by serving as a witness; (3) in prejudging Perroni's case; (4) by incarcerating Ross, which demonstrated animus and retaliation against Perroni; (5) by conducting an *ex parte* investigation of the facts; and (6) by demonstrating an appearance of impropriety. We first address Perroni's two general contentions involving recusal and contempt because the conclusions we reach on these two matters render it unnecessary to reach some of the subpoints Perroni raises.

Our law regarding recusal and contempt is well settled. When recusal is in issue, this court has held that a judge has a duty to sit on a case unless there is a valid reason to disqualify, and, on appeal, we presume impartiality on the trial judge's part. *See Walls v. State*, 341 Ark. 787, 20 S.W.3d 322 (2000); *Ark. Dep't of Human Servs. v. R.P.*, 333 Ark. 516, 970 S.W.2d 225 (1998) (judges are presumed to be impartial, and the party seeking disqualification has the burden of showing otherwise). This court has also held the standard of review on appeal is whether the trial judge abused his or her discretion in the matter. *Osborne v. Power*, 318 Ark. 858, 890 S.W.2d 570 (1994).

Upon our review of the record, we hold that Perroni has failed to demonstrate the required bias on Judge Fox's part. While Perroni alleges Fox erred by serving as prosecutor and as a witness, in prejudging Perroni's case, in incarcerating Ross, and in conducting an *ex parte* investigation when preparing for a show-cause hearing, the primary issue is whether he disobeyed Judge Fox's scheduling order.

Arkansas law is settled that an act is contemptuous if it interferes with the order of the court's business or proceedings or reflects upon the court's integrity. *Allison v. DuFresne*, 340 Ark.

583, 12 S.W.3d 216 (2000). This court has also held that the disobedience of any judgment, order, or decree of a court having jurisdiction to enter it is such an interference with the administration of justice as to constitute contempt. *Ivy v. Keith*, 351 Ark. 269, 92 S.W.3d 671 (2002). For example, in *Johnson v. Johnson*, 343 Ark. 186, 33 S.W.3d 492 (2000), two prosecutors were in direct criminal contempt when they did not comply with a scheduling order and proceed to trial on the trial date. By adopting a rule of criminal procedure, this court has emphasized that control of the trial calendar is a matter that rests solely with the trial judge who shall provide for the scheduling of cases upon the calendar. *See* Ark. R. Crim. P. 27.2. Accordingly, this court has held that the scheduling of cases is tantamount to a direct order of the court, *id.*, *see also Rischar v. State*, 307 Ark. 429, 821 S.W.2d 25 (1991), and we have stated that the trial judges of this state have an obligation to assure that their courts are conducted in an orderly and correct manner. *See Florence v. Taylor*, 325 Ark. 445, 928 S.W.2d 330 (1996). Our court has also held that an attorney's failure to appear pursuant to a supreme court show-cause order was direct contempt. *Street v. State*, 331 Ark. 443, 959 S.W.2d 747 (1998).

The standard of review in a case of criminal contempt, as we have here, requires this court to view the record in the light most favorable to the trial judge's decision and to sustain that decision if it is supported by substantial evidence and reasonable inferences. *Etoch v. Simes*, 340 Ark. 449, 10 S.W.3d 866 (2000).

From a careful review of the record before us, one thing is quite clear and entirely undisputed: that Sam Perroni disobeyed Judge Fox's scheduling order. On August 5, 2002, both Perroni and his client, Ross, signed a notice order which set Ross's state criminal trial for four days beginning on February 11, 2003. Only two days after Perroni and Ross executed the state court's scheduling order, Perroni was apprised on August 7, 2002, by Federal District Court Judge Susan Webber Wright, that another of Perroni's defendants, Steve Pirani, was scheduled for a federal trial on September 4, 2002. However, Perroni immediately notified Judge Wright that he had another federal trial in a different federal district court that would conflict with the Pirani September 4 trial setting. Judge Wright then rescheduled the Pirani case to begin on February 10, 2003 — a date that conflicted with the February 11 setting in the Ross state case. In fact, the record fails to reflect that

Perroni *ever* notified Judge Wright that the Pirani trial date conflicted with Perroni's Ross case in state court.

As pointed out earlier in this opinion, Perroni had numerous opportunities to bring the state trial conflict in Ross to Judge Wright's attention, but Perroni simply chose not do so. To make matters worse, Perroni waited until January 31, 2003, to ask Judge Fox for a new setting in the Ross case. Judge Fox held a hearing on Perroni's continuance motion on February 5, 2003, at which time the judge denied Perroni's motion. Perroni then moved to withdraw as Ross's counsel. Judge Fox denied that motion when Perroni explained that it would be impossible for new counsel to be prepared to defend Ross by the February 11, 2003, trial date. The record reveals that, as early as August 7, 2002, and for approximately five months, Perroni knew that he had a scheduling conflict in the state Ross case and federal Pirani case, but Perroni never told Judge Wright, and waited to inform Judge Fox until only days before the respective cases were to be tried. At the February 5, 2003, hearing on Perroni's motion for continuance, Judge Fox informed Perroni that the Ross case was the oldest one on his docket, and needed to be tried. Perroni advised Judge Fox that he did not have an actual conflict with the Pirani case until January 31, 2003, when Federal Judge Wright advised counsel that jury selection in the Pirani case would begin on February 10, 2003. When it became apparent that Fox was not going to grant a continuance, Perroni told Judge Fox that, "If you want, I'll file a motion for continuance with Judge Wright." Fox answered, "No, it's been the practice of this court, under the previous judge, that [attorneys] had to manage their own dockets."[3]

As already discussed above, this court has held that state trial judges have an obligation to assure their courts are conducted in an orderly and correct manner. The trial court does so by scheduling cases, which is tantamount to a direct order of the court, and the

---

[3] At the March 14, 2003, hearing on the show-cause order, Judge Fox clarified these comments, stating as follows:

My understanding of the question, the tone in which it was asked at that time, was that Mr. Perroni was attempting to get this court to order him to file a motion for continuance so that he could represent to Judge Wright that that's what had happened. It's not this court's obligation to manage Mr. Perroni's litigation practice, and it's certainly not — he's not entitled to use the authority of this court to represent to some other judge that that's what has been ordered.

disobedience of that order is such an interference with the administration of justice as to constitute contempt.

Here, Perroni asserts that he did everything he could to address and alleviate the scheduling conflict regarding the Ross and Perani cases, but his assertion is not borne out by his own assessment of the facts. As previously noted, Perroni concedes that nowhere in the record is it shown that he *ever* informed Judge Wright that the state case of *Ross v. State* had been set prior to the Pirani case, even though Perroni had many opportunities to do so. If Perroni had done so, and Judge Wright had refused to continue or to reset the Pirani case on her docket, then perhaps Perroni's argument may have had some merit.

■ It is most reasonable and plausible to believe Judge Wright would have deferred to the State to try its case first, since it was set prior to Pirani's case and the Ross case was the oldest active case on the state court's docket. It is equally reasonable for Judge Fox to reject Perroni's last minute "offer" to advise Judge Wright that *Judge Fox wanted Perroni* to file a continuance motion in the Pirani case. At this late stage of the Ross and Pirani cases, it was Perroni's responsibility, not Judge Fox's, to let Judge Wright know how Perroni got himself into this conflict situation. Again, Perroni repeatedly conceded he *never* put Judge Wright on notice of the conflict between the state and federal courts' scheduling orders. In viewing Perroni's failure to address his conflict problem with both the federal and state judges when he had more than five months to do so, Judge Fox was correct in holding that Perroni's disobedience of the scheduling order constituted contempt because Perroni's actions (or inactions) clearly interfered with the trial court's business or proceedings and reflected upon the court's integrity.

■ ■ As discussed above, Perroni raised six subpoints whereby he attempts to question Judge Fox's bias and attacks Judge Fox's refusal to recuse. However, none of these points adversely affect the facts and Perroni's concessions, which we have already held support Judge Fox's finding of contempt. Consequently, these points become superfluous matters, and we need not address them further. Based on these facts, Judge Fox was justified in issuing a show-cause order and finding Perroni in contempt for willfully failing to comply with the state court's scheduling order.

Before leaving Perroni's recusal and contempt issues, we consider Perroni's additional argument that the Supremacy Clause of the United States Constitution required him to obey the federal

court scheduling order, rather than the state court's order. The Supremacy Clause, found in Article 6 of the Constitution, provides that:

> [t]his Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding.

As the State points out, this is a challenge to the validity of the circuit court's order, and as such, it cannot be considered in this appeal. *See Carle v. Burnett*, 311 Ark. 477, 845 S.W.2d 7 (1993) (court will not go behind the order to determine its validity). Moreover, the argument is meritless. Perroni cites nothing that would support his apparent assertion that a federal court's trial date is tantamount to a "law[ ] of the United States," such that it would utterly nullify a state court's order. A Pennsylvania court rejected an identical argument in a factually identical case as "frivolous and lacking merit." *See Swoyer v. Commonwealth Department of Transportation*, 599 A.2d 710 (Pa. Commonw. Ct. 1991). We agree with the *Swoyer* court.

Finally, we turn to Perroni's third point for reversal, wherein he contends that the trial court failed to accord him his constitutional protections. Perroni first argues that the trial court erred when it denied his motion for jury trial on the contempt charge, and violated the provisions of *Brady v. Maryland*, 373 U.S. 83 (1963), when it denied his motion for exculpatory evidence.

In support of his argument that Judge Fox denied him his constitutional right to a jury trial, Perroni cites *Etoch v. State*, 343 Ark. 361, 37 S.W.3d 186 (2001). However, *Etoch* actually undermines Perroni's argument. There, Louis Etoch was charged with criminal contempt, tried without a jury, and sentenced by the trial judge to only a few days in prison. In reversing, this court noted that criminal penalties may not be imposed on an alleged contemnor who has not been afforded the protections that the Constitution requires of criminal proceedings. *Id.* at 365 (citing *Fitzhugh v. State*, 296 Ark. 137, 752 S.W.2d 275 (1988)).

However, petty contempt, like other petty criminal offenses, may be tried without a jury. *Id.* (citing *Taylor v. Hayes*, 18 U.S. 488 (1974)). Contempt of court is a petty offense when the penalty actually imposed does not exceed six months or a longer

penalty has not been expressly authorized by statute. *Id.* In cases of criminal contempt, this court wrote, the better practice is for the trial judge to announce at the outset whether punishment in excess of six months may be imposed. If the judge does not contemplate the imposition of a greater sentence, *a jury is not necessary*; otherwise, one may be demanded." *Id.* (emphasis added).

■ Here, at the outset of the March 5, 2003, hearing, Judge Fox stated from the bench the following: "I am announcing that in the event of a finding of criminal contempt by the court, *the range of punishment will not exceed six months' incarceration.*" (Emphasis added.) Therefore, under the explicit holding of *Etoch*, Perroni was not entitled to a jury trial, and the trial court did not err in denying his request for one. To note the obvious, Judge Fox never imposed *any* incarceration in this contempt matter.

■■ Next, Perroni contends that the judge erred in denying his motion for exculpatory evidence. *Brady v. Maryland*, 373 U.S. 83 (1963), of course, held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *See also Cloird v. State*, 349 Ark. 33, 76 S.W.3d 813 (2002); Ark. R. Crim. P. 17.1(d). However, Perroni cites no case, and our research has revealed none, where the *Brady* requirements have been held to be applicable in contempt proceedings; this makes sense, because there is no prosecutor, *per se*, in contempt matters. Instead, the purpose of a criminal contempt proceeding is that it is brought to preserve the power and vindicate the dignity of the court and to punish for disobedience of its order. *Fitzhugh v. State*, 296 Ark. 137, 752 S.W.2d 275 (1988).

■ It is true that this court has held that criminal penalties may not be imposed on an alleged contemnor who has not been afforded the protections that the Constitution requires of criminal proceedings. *See id.* at 140. However, to date, this court has only held that due process requires, in criminal contempt proceedings, that an alleged contemnor be notified that a charge of contempt is pending against him and be informed of the specific nature of that charge. *Id.; see also Ark. Dep't of Human Servs. v. R.P., supra*. Perroni cites no authority to the contrary, and because this court will not consider an argument made without convincing authority, we reject Perroni's *Brady* claim.

Furthermore, the court rejects Perroni's claim because he has made no showing that the State — to the extent it was required to be involved here — "was ever aware of or in possession of such [exculpatory] evidence." *See Andrews v. State,* 344 Ark. 606, 42 S.W.3d 484 (2001) *(per curiam)*. In *State v. Larimore,* 341 Ark. 397, 17 S.W.3d 87 (2000), citing *Strickler v. Greene,* 527 U.S. 263 (1999), we stated the test for *Brady* violations as follows:

> The Court, in *Strickler,* . . . outlined three elements of a true *Brady* violation. These components include: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either wilfully or inadvertently; and (3) prejudice must have ensued.

In *Lee v. State,* 340 Ark. 504, 11 S.W.3d 553 (2000), we noted that prejudice can be demonstrated when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. However, key among these factors is that *prejudice must be demonstrated.*

Here, Perroni does not even argue that he was prejudiced; instead, he baldly asserts that Judge Fox "committed reversible error by failing to accord Perroni his constitutional protections provided under *Brady* and its progeny." We have repeatedly held that we will not reverse in the absence of a demonstration of prejudice. *See Stivers v. State,* 354 Ark. 140, 118 S.W.3d 558 (2003); *Ridling v. State,* 348 Ark. 213, 72 S.W.3d 466 (2002); *Ramaker v. State,* 345 Ark. 225, 46 S.W.3d 519 (2001). Therefore, because Perroni has not demonstrated prejudice, this court affirms on this issue.

For the reasons stated above, we affirm.

BROWN, IMBER, and THORNTON, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting. While I agree that there is sufficient evidence to support a finding of contempt in this case, the majority has sidestepped the more critical issue in failing to address Mr. Perroni's arguments in regard to recusal. Under the facts and circumstances of this case, I believe that Judge Fox should have recused. Therefore, I must respectfully dissent.

The majority gives short shrift to Mr. Perroni's recusal argument. While the allegations contained in Mr. Perroni's mo-

tion for recusal are recited, the majority opinion is bereft of the facts and circumstances underlying the motion. Instead, after reciting our well-settled principles of law on recusal, the majority quickly disposes of Mr. Perroni's argument stating, "the primary issue is whether [Mr. Perroni] disobeyed Judge Fox's scheduling order." Of vital importance is the majority's failure to address Judge Fox's independent investigation in the contempt proceeding he initiated against Mr. Perroni.

In order to understand the context of the argument on appeal, a more detailed statement of the facts is necessary. On February 11, 2003, Mr. Perroni failed to appear and represent his client, Richard Ross, in a criminal trial due to a conflict he had in representing another defendant, Steven Pirani, in federal court. Mr. Ross made an appearance and Mr. Perroni's law partner, Patrick James, made a special appearance on Ross's behalf. The State prosecutor reported ready to proceed, but the court continued the case because the defendant did not have representation by counsel. On that same day, Mr. James requested that Judge Fox recuse from the *Ross* case.

The following day, February 12, 2003, while conducting a bond hearing in the *Ross* case, Judge Fox entered an order directing Mr. Perroni to show cause why he should not be held in contempt of court for his failure to appear with his client, Mr. Ross, at the February 11 criminal trial. The court scheduled a show-cause hearing for March 14, 2003. On February 18, 2003, Mr. Perroni filed a motion suggesting that Judge Fox recuse from the contempt proceeding. The judge denied this motion. During a hearing conducted by Judge Fox on March 5, 2003, Mr. Perroni again asked Judge Fox to recuse from the contempt proceeding. This oral request was also denied.

Then, on March 10, 2003, Judge Fox directed his law clerk to purchase certified copies of pleadings and orders filed in the federal *Pirani* case. The judge gave the law clerk cash from his own personal funds to pay for the documents.[1] On March 14, 2003, Judge Fox conducted the show-cause hearing. Mr. Perroni again

---

[1] Initially, the judge gave his law clerk cash in the amount of $20. The cost of the certified documents, however, totaled $55.20, whereupon the law clerk wrote a personal check for the difference. Judge Fox subsequently reimbursed his law clerk the sum of $35.20 out of his own pocket. Nothing in the record reflects that the judge requested reimbursement from Pulaski County for the cost of the certified documents.

requested that Judge Fox recuse from the contempt proceeding, and the judge once again denied the motion. At the hearing, over Mr. Perroni's objection, Judge Fox introduced the certified federal documents obtained by his law clerk as evidence in the contempt proceeding. On May 9, 2003, Mr. Perroni filed a fourth and final motion requesting that Judge Fox recuse, which motion was again denied by the judge. On May 14, 2003, Judge Fox entered the order finding Mr. Perroni in willful contempt and ordered him to pay $780.00 as reimbursement for jurors' fees; $443.72 to reimburse the prosecutor's office for various witness fees; $55.20 to reimburse Pulaski County for the expense of copying and certifying federal court *Pirani* pleadings, and a $1,000 fine.

This court's general standard of review for cases involving recusal is well settled. The decision to recuse is within the trial court's discretion, and it will not be reversed absent abuse. *Anderson v. State,* No. Cr02-190, slip op. (April 29, 2004). An abuse of discretion can be proved by a showing of bias or prejudice on the part of the trial court, and the burden is on the party seeking to disqualify. *Id.* To decide whether there has been an abuse of discretion, we review the record to see if prejudice or bias was exhibited. *Id.* A trial judge's development of opinions, biases, or prejudices during a trial do not make the trial judge so biased as to require that he or she recuse from further proceedings in the case. *Id.* Absent some objective demonstration by the appellant of the trial judge's prejudice, it is the communication of bias by the trial judge which will cause us to reverse his or her refusal to recuse. *Id.* The mere fact of adverse rulings is not enough to demonstrate bias. *Id.* Whether a judge has become biased to the point that he should disqualify himself is a matter to be confined to the conscience of the judge. *Id.* The reason is that bias is a subjective matter peculiarly within the knowledge of the trial judge. *Id.*

We have few cases applying this standard of review to cases where a trial judge declines to recuse from a contempt hearing after issuing an order to show cause. In *Clark v. State,* 287 Ark. 221, 697 S.W.2d 895 (1985), this court concluded that a trial judge erred in not recusing from a contempt hearing. The court explained that " 'a judge's impartiality can be threatened when the alleged contempt consists of a *personal attack* on the trial judge, of such a nature that the judge actually becomes embroiled in a personal dispute with the alleged contemnor, or that a 'normal' judge would likely be personally affected even though his feelings remain under control, . . .'" *Id.*(citing *Mayberry v. Pennsylvania,* 400 U.S.

455 (1971)). In *Clark*, the alleged contemnor's motion to recuse alleged criminal activity on the part of the judge, which this court considered a "personal attack" that required recusal. *Id.*

The *Clark* court relied upon a decision by the United States Supreme Court where a *pro se* defendant made slanderous statements against the judge during the case, and, instead of immediately holding the defendant in contempt, the court waited until the conclusion of the trial to prosecute each act of contempt. *Mayberry v. Pennsylvania*, 400 U.S. 455 (1971). The Court held that in such a case, where no injustice would be served by recusal, due process requires a judge to recuse from the contempt hearing to keep a fair and balanced trial. *Id.* The *Mayberry* court quoted language from a prior decision:

> Whether the trial be federal or state, the concern of due process is with the fair administration of justice. At times a judge has not been the image of 'the impersonal authority of law,' *Offutt v. United States*, 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11, but has become so 'personally embroiled' with a lawyer in the trial as to make the judge unfit to sit in judgment on the contempt charge.

> 'The vital point is that in sitting in judgment on such a misbehaving lawyer the judge should not himself give vent to personal spleen or respond to a personal grievance. These are subtle matters, for they concern the ingredients of what constitutes justice. Therefore, justice must satisfy the appearance of justice.' *Id.*, at 14, 75 S.Ct., at 13.

*Mayberry v. Pennsylvania*, 400 U.S. at 464.

In this case, Mr. Perroni contends that Judge Fox crossed the line of impartiality when he made an independent investigation of the facts by procuring documents in an unrelated case from a federal court. The State argues that there was not an exhibition of partiality because Judge Fox was at liberty to take judicial notice of the federal documents. This court, however, has held that Arkansas courts are forbidden from taking judicial notice of their own records, as well as records and proceedings from other courts. *See Braswell v. Gehl*, 263 Ark. 706, 567 S.W.2d 113 (1978); *see also Brissett v. Sykes*, 313 Ark. 515, 519, 855 S.W.2d 330, 333 (1993) ("Courts may not take judicial notice of prior or pending litigation in other cases, even if those cases are between the same parties."); *Smith v. State*, 307 Ark. 223, 228, 818 S.W.2d 945, 948 (1991)

(holding that judicial notice may not be taken of the record in a separate case); *Southern Farmers Association, Inc. v. Wyatt,* 234 Ark. 649, 655, 353 S.W.2d 531, 534 (1962) ("[t]he general rule is that a court will not take judicial notice of its own records or proceedings in another independent case or proceeding, unless required to do so by statute.").

Not only was Judge Fox prohibited from taking judicial notice of the federal documents, our own Code of Judicial Conduct proscribes his conduct. We have held that the canons and text establish mandatory standards, not mere guidelines. *See Horton v. Ferrell,* 335 Ark. 366, 981 S.W.2d 88 (1998). The Commentary to Canon 3 of the Arkansas Code of Judicial Conduct provides: "A judge must not independently investigate facts in a case and must consider only the evidence presented." When Judge Fox sent his law clerk to the federal court to search through the *Pirani* record and bring back copies to be used in the contempt proceeding, Judge Fox inappropriately conducted an independent investigation into the facts of a case.

The majority's statements notwithstanding, we have not required a showing of actual bias in all recusal cases. We have stated that where a judge exhibits bias or the appearance of bias, we will reverse. *City of Jacksonville v. Venhaus,* 302 Ark. 204, 788 S.W.2d 478 (1990). The proper administration of the law requires not only that judges refrain from actual bias, but also that they avoid all appearance of unfairness. *Id.* In *Venhaus,* we held that a judge should have recused to avoid the mere appearance of bias. *Id.* More recently, we held that a trial judge should recuse from deciding Rule 11 sanctions where the judge's comments and rulings indicated that he was biased. *Allen v. Rutledge,* No. 03-330, slip op. (Dec. 18, 2003). We related the proceedings to a contempt charge and stated:

> [A]ll of such cases . . . present difficult questions for the judge. All we can say on the whole matter is that where conditions do not make it impracticable, or where the delay may not injure the public or private rights, a judge called upon to act in a case of contempt by personal attack upon him, may, without flinching from his duty, properly ask that one of his fellow judges take his place.

*Id.* (quoting *Cooke v. United States,* 267 U.S. 517, 539 (1925)). Likewise, in *Horton v. Ferrell,* 335 Ark. 366, 981 S.W.2d 88 (1998), we explained that a master was required to recuse after having made an independent investigation without a showing of actual bias.

We are not presented with a case where Judge Fox's recusal would have been impracticable or where delay would have caused injury. In addition, by infusing himself into the merits of the underlying proceeding, Judge Fox made an independent investigation and became "personally embroiled" in the matter. Other jurisdictions have come to similar conclusions. *See DeSalle v. AppelBerg*, 44 Conn.App. 323, 688 A.2d 1356 (1997) (granting a mistrial after a trial judge made an independent investigation); *Garrard v. Stone*, 624 N.E.2d 68 (Ind. 1993) (granting a new trial after the trial court conducted an independent investigation); *State v. McCrary*, 676 N.W.2d 116 (S.D. 2004) (reversing a case for resentencing based upon a trial court's independent investigation). The appearance of an impartial judge is fundamental to our legal system. As the United States Supreme Court aptly stated, "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 17 (1954).

Lest I be misunderstood, I do not suggest that a judge should be required to recuse whenever an order to show cause is issued and a contempt action is pursued. Quite to the contrary, I am well aware that contempt is a unique proceeding where the judge acts as both trier and finder of fact. *Henry v. Eberhard*, 309 Ark. 336, 832 S.W.2d 467 (1992). Nonetheless, where the judge presiding over a contempt proceeding marshals the evidence to be used at trial by making an independent investigation into the facts, the most fundamental notion of justice and fair play requires the judge to recuse.

For the above stated reasons, I respectfully dissent.

BROWN, J., joins.

RAY THORNTON, Justice, dissenting. I respectfully dissent because I believe that Judge Fox should have recused from the contempt proceedings against Mr. Perroni and that Mr. Perroni should be given the opportunity for a trial before an impartial tribunal.

### I. Facts

Because the majority opinion does not fully recite all the circumstances relating to Mr. Perroni's points on appeal, a more detailed statement will be given.

On July 1, 2000, a felony information was filed by the State against Richard Ross, Mr. Perroni's client, and two other defendants. Mr. Ross faced felony tax-fraud charges. On August 5,

2002, Mr. Perroni executed an acknowledgment of a scheduling order, which stated that Mr. Ross's four-day jury trial was scheduled for 9:00 a.m. on February 11, 2003. Judge David Bogard presided at the time. During Judge Bogard's tenure on the bench, the practice was for the prosecutors to select on jury trial days which cases should be tried first. Capital felonies and child-abuse cases were given top priority.

Mr. Perroni also represented a client, Steven Pirani, in federal court. Mr. Pirani and two co-defendants were charged with numerous felony offenses. On August 9, 2002, Mr. Perroni filed a motion for continuance on behalf of Mr. Pirani, in federal court with United States District Judge Susan Webber Wright. The federal district court entered an order granting a continuance in the *Pirani* case on September 4, 2002, and a jury trial for Mr. Pirani and his two co-defendants was scheduled for 9:30 a.m. on February 10, 2003. Mr. Perroni stated that he thought the cases would be severed and that the two co-defendants would be tried first. Judge Wright entered two orders, dated January 6, 2003, and January 17, 2003, respectively, in the *Pirani* case and recited that Mr. Pirani's case was scheduled for February 10, 2003.

During a telephone conference on January 31, 2003, Mr. Perroni learned that the federal court had decided to try Mr. Pirani's case first ahead of his two co-defendants. When Mr. Perroni learned that Mr. Pirani's case was going to be tried first, he filed a motion for continuance in the *Ross* case with Judge Tim Fox, the newly-elected judge who replaced Judge Bogard.

On February 4, 2003, the federal district court entered an order, stating that there would be two separate trials of the *Pirani* defendants with Mr. Pirani's trial set to begin on February 10, 2003.

On that same day, February 4, 2003, a hearing was held before Judge Fox on Mr. Perroni's motion for continuance in the *Ross* case. Mr. Matthew House, an associate of Mr. Perroni's law firm, appeared before Judge Fox on behalf of Mr. Ross. Judge Fox denied the motion for continuance. That afternoon, Mr. Perroni appeared and made an oral request that the order denying his motion for continuance be reconsidered.

On February 5, 2003, Mr. Perroni appeared at the hearing on his motion for reconsideration. At the hearing, Mr. Perroni told Judge Fox that there was a conflict in federal court because of

his *Pirani* case on February 10, 2003, and Mr. Perroni offered to file a continuance with the federal court. The following colloquy occurred:

> MR. PERRONI: But I didn't have a conflict with being over there [in federal court] on the 10th. I can file a motion — if you want, I'll file a motion for continuance with Judge Wright.

> THE COURT: No. I'm just — and it's been the practice of this court, under the previous judge, that because they had to manage their own dockets, that the prosecutors got to select on jury trial days which ones they felt they were out of time with or which ones were going to go, and that may have been what happened obviously on the capital felony murder thing.

> MR. PERRONI: Right.

> THE COURT: That's not necessarily going to be the case from now on because, for instance, I'm telling you that Mr. Ross has to go to trial. I'll also be telling them that I don't care what else is set for that day, this is first out for that day. And that nobody else, no matter what it is, is bumping anything for those three days. This one is going to go to trial.

At that time, Mr. Perroni represented to Judge Fox that the federal district court's decision to decide Mr. Pirani's case before his two co-defendants' was made on January 31, 2003, a few days before the February 5 hearing. Mr. Perroni then made an oral motion to withdraw because he could not try two cases at once. That motion was taken under advisement pending Mr. Ross's ability to find substitute counsel. On February 7, 2003, Judge Fox sent a letter denying Mr. Perroni's motion to be relieved as counsel without prejudice.

On February 10, 2003, Mr. Perroni attached a copy of Judge Wright's scheduling order, which reflected the February 10, 2003, trial date in the *Pirani* case to his renewed motion for continuance and renewed motion to withdraw as counsel in the *Ross* case.

The *Ross* case was called for trial in state court on February 11, 2003. Mr. Perroni, who was representing his client in federal court, did not appear with Mr. Ross, but Mr. Patrick James, Mr.

Perroni's law partner, appeared on Mr. Ross's behalf. Because Mr. Ross had not found substitute counsel, Mr. Ross's trial had to be rescheduled. Judge Fox denied Mr. Perroni's motion for continuance and motion to withdraw made by Mr. James. Citing Ark. Code Ann. § 16-84-111(b) (Supp. 2003), Judge Fox ruled that Mr. Ross was to be taken into custody.

On the afternoon of February 11, 2003, Mr. James appeared before Judge Fox and moved to dismiss the charges against Mr. Ross and requested that he be released from jail. At the hearing, Mr. James argued three points: (1) that Judge Fox should disclose all *ex parte* communication involving a letter sent by Judge Fox, (2) that Judge Fox should recuse on the basis of bias, and (3) that Judge Fox held Mr. Ross in custody in an attempt to punish Mr. Perroni for failing to appear with Mr. Ross that morning. Judge Fox denied Mr. Ross's release and refused to set a hearing on the matter for the following day.

On February 12, 2003, Judge Fox issued an order to show cause for Mr. Perroni's failure to appear at Mr. Ross's February 11 trial. Judge Fox then decided to release Mr. Ross from jail on two conditions: (1) that the bond remain in effect and (2) that Mr. Ross find substitute counsel within two weeks for a July 29, 2003, jury trial. Judge Fox's decision to release Mr. Ross was based upon information obtained by Judge Fox's staff, who called the bonding company to inquire about Mr. Ross's bond. Judge Fox's staff called the bonding company again on the morning of February 12, 2003, and the bonding company, who had been contacted by Mr. James the previous evening, replied that "they would remain on [Mr. Ross's] bond pending the next trial setting."

On February 18, 2003, Mr. Perroni filed a motion requesting Judge Fox's recusal. In his motion, Mr. Perroni further alleged that Judge Fox violated the Code of Judicial Conduct when he investigated Mr. Ross's bond. Judge Fox denied the motion.

On March 5, 2003, Judge Fox conducted a hearing on numerous motions filed by Mr. Perroni. Among the motions filed by Mr. Perroni were motions on recusal, impartiality, jury trial, and *ex parte* communications. Judge Fox denied all four motions.

Subsequently, on March 10, 2003, Judge Fox directed his law clerk, Mr. David Eanes, to go to the United States District Court Clerk's office for the purpose of obtaining copies of pleadings and scheduling orders in Mr. Perroni's federal case. Judge Fox gave Mr. Eanes $20.00 cash of his own money to make copies of

these documents. Mr. Eanes complied with Judge Fox's order, went to the federal courthouse, perused the federal file, chose various orders, and made the copies. Because the cost was a total of $55.20, and Judge Fox had given Mr. Eanes $20.00 in cash, Mr. Eanes wrote a check from his personal banking account for the difference of $35.20. Mr. Eanes returned to the county courthouse where he told Judge Fox that the pleadings cost more than $20.00. Mr. Eanes gave the orders and receipts to Judge Fox, and Judge Fox reimbursed Mr. Eanes by giving him $35.20 from his own pocket. Nothing in the record reflects that reimbursement vouchers for this expense were ever filed with Pulaski County.

On March 13, 2003, Mr. Perroni filed a notice of removal of the *Ross* case to federal court.

On March 14, 2003, the evidentiary portion of Mr. Perroni's contempt hearing was held. Mr. Tim Dudley represented Mr. Perroni, and renewed Mr. Perroni's motion that Judge Fox recuse based upon the allegation that Judge Fox was prosecuting the case and was presiding as a judge.

Mr. Dudley also objected to the relevancy of the admission of the federal pleadings in the *Pirani* case. Specifically, he argued that Judge Fox and his law clerk, Mr. Eanes, conducted an *ex parte* investigation by going to federal court to retrieve the federal pleadings in the *Pirani* case. Judge Fox denied the motion for recusal and overruled the objections regarding the federal pleadings. Judge Fox proceeded with the evidentiary portion of the hearing during which Judge Bill Wilson, a federal district judge, testified as a character witness for Mr. Perroni. Judge Fox withheld any decision pending the federal court's decision on the notice of removal.

The federal district court remanded the *Ross* case to state court on May 6, 2003.

On May 9, 2003, Mr. Perroni filed a supplement to his motion to recuse, alleging five points: (1) that Judge Fox's independent investigation was in violation of the Code of Judicial Conduct, (2) that recusal is mandatory as the trial court developed personal knowledge of disputed evidentiary facts concerning the proceedings, (3) that the court exhibited actual bias by serving as the prosecutor and introducing evidence against Mr. Perroni, (4) that the trial court demonstrated actual bias and a conflict of interest by providing testimony against Mr. Perroni, and (5) that

Judge Fox must recuse as a party opponent in pending litigation with Mr. Perroni and his law firm concerning the Freedom of Information Act.

Mr. Perroni's final contempt hearing was held on May 12, 2003. Judge Fox presided over this hearing and denied the motion. Judge Fox found Mr. Perroni guilty of contempt of court.

On May 14, 2003, Judge Fox entered an order finding Mr. Perroni in contempt and ordered him pay $780.00 as reimbursement for jurors' fees; $443.72 to reimburse the prosecutor's office for various witness fees; $55.20 to reimburse Pulaski County for the expense of copying and certifying federal court *Pirani* pleadings, and a $1,000.00 fine.[1]

Mr. Perroni timely filed his notice of appeal on May 15, 2003. On May 16, 2003, a hearing was held on a companion *Perroni* case involving requests made under the Freedom of Information Act, and the trial court ruled that Mr. Eanes's personal check was a public record under the Freedom of Information Act.

On May 22, 2003, approximately one week after the contempt order was entered, Judge Fox recused from the *Ross* case.

On appeal, Mr. Perroni makes three allegations of error. First, he argues that Judge Fox erred by failing to recuse. Second, he contends that there was insufficient evidence to find him in "willful" contempt. Third, he argues that Judge Fox committed reversible error by failing to guarantee a jury trial in the contempt proceeding.

## II. Scheduling conflict

In addressing Mr. Perroni's points on appeal, I cannot agree with the majority's analysis. The majority considers the threshold issue as a question whether Mr. Perroni disobeyed Judge Fox's scheduling order. Here, there is no doubt that Mr. Perroni did not appear for Mr. Ross's February 11, 2003, trial. That fact does not appear to be in dispute, and Mr. Perroni's non-appearance goes to the heart of his second point on appeal involving his alleged contempt.

---

[1] As noted above, Judge Fox had not sought reimbursement for his personal expenses in securing the evidence at the time he ordered Mr. Perroni to reimburse Pulaski County for these expenses.

However, the troubling facts surrounding Mr. Perroni's non-appearance give rise to his first point on appeal: whether Judge Fox should have recused. The majority views this point on appeal as "superfluous" and fails to address it. I view the recusal issue as the threshold issue in the case because if this court concludes that Judge Fox should have recused, then he should not have presided over Mr. Perroni's contempt hearing.

### III. Recusal

For his first point on appeal, Mr. Perroni argues that Judge Fox committed reversible error by failing to recuse. Specifically, he makes the following arguments: (1) Judge Fox committed reversible error in serving as a prosecutor; (2) Judge Fox committed reversible error in serving as a witness; (3) Judge Fox committed reversible error in prejudging the case; (4) Judge Fox's improper incarceration of Ross demonstrated animus and retaliation; (5) Judge Fox's independent ex parte investigations of the facts of the case mandated his recusal, and (6) there was an appearance of impropriety mandating Judge Fox's recusal.

The majority calls these sub-issues "superfluous," but I find them compelling and, ultimately, dispositive of Mr. Perroni's first point on appeal. For the purpose of this dissent, I will focus primarily on the allegations involving Mr. Ross's incarceration as demonstrating retaliation against Mr. Perroni and the issue involving the *ex parte* investigation as the basis for Judge Fox's recusal.

This court recently articulated our standard of review for recusal in *Manila School Dist. No. 15 v. Wagner*, 357 Ark. 20, 159 S.W.3d 285 (2004), where we stated:

> A trial judge has a duty not to recuse from a case where no prejudice exists. Thus, if there is no valid reason for the judge to disqualify himself or herself, he or she has a duty to remain on a case. There is a presumption that judges are impartial. The person seeking disqualification bears the burden of proving otherwise. The trial judge's decision not to recuse from a case is a discretionary one and will not be reversed on appeal absent an abuse of that discretion. An abuse of discretion can be shown by proving bias or prejudice on the part of the trial judge. To decide whether there has been an abuse of discretion, this court reviews the record to determine if prejudice or bias was exhibited. It is the appellant's burden to demonstrate such bias or prejudice.

*Id.* (citation omitted).

Further, judges must refrain from presiding over cases in which they might be interested and must avoid all appearance of bias. *Arkansas Dept. of Human Services v. R.P.*, 333 Ark. 516, 538, 970 S.W.2d 225, 236 (1998). To decide whether there was an abuse of discretion, we review the record to determine if any prejudice or bias was exhibited. *Id.* The question of bias is usually confined to the conscience of the judge. *Id.* Judges are presumed to be impartial, and the party seeking disqualification has the burden of showing otherwise. *Id.*

This court made it abundantly clear in *Clark v. State*, 287 Ark. 221, 697 S.W.2d 895 (1985), that when remarks indicate that the judge is "embroiled in a personal dispute," then the judge should recuse from the case. *Id.*

The Eighth Circuit cited *Clark, supra,* with approval in *Smith v. Lockhart*, 923 F.2d 1314, 1322 (8th Cir. 1991), where it stated:

> In *Johnson v. Mississippi,* 403 U.S. 212, 91 S. Ct. 1778, 29 L. Ed.2d 423 (1971) (*per curiam*), a defendant was cited for contempt during his trial. *Id.* at 213, 91 S. Ct. at 1779. Johnson moved the judge to recuse himself from presiding over the contempt proceeding because of bias. Johnson then filed a federal civil rights lawsuit naming the judge as a defendant. Johnson again asked the judge to remove himself, which the judge refused to do. The judge found Johnson guilty of contempt and sentenced him to jail. *Id.* at 213-14, 91 S. Ct. at 1779-80. The Court held that the judge should have recused himself because the federal lawsuit naming him as a defendant made it impossible for him to be unbiased toward Johnson. *Id.* at 215-16, 91 S. Ct. at 1780-81. The D.C. Circuit has explained the import of *Johnson:*
>
> > Thus, the trial judge, by virtue of his status as a defendant in a suit brought by the alleged contemnor, was in an adversary posture with respect to him, and was presumptively biased. *This is true even though the judge's status as an adversary party was created by an action of the alleged contemnor filing suit. . . .*
>
> *United States v. Meyer,* 462 F.2d 827, 842 (D.C. Cir. 1972) (emphasis added).
>
> In general, judges should recuse themselves when they have become enmeshed in personal disputes with parties before them. *See, e.g., id.* at 836; *Clark v. State,* 287 Ark. 221, 697 S.W.2d 895, 897

(1985). The Supreme Court has explained that "when the trial judge is discovered to have had some basis for rendering a biased judgment, his actual motivations are hidden from view, and we must presume the process was impaired." *Vasquez v. Hillery,* 474 U.S. 254, 263, 106 S. Ct. 617, 623, 88 L. Ed. 2d 598 (1986) (dicta) (citing *Tumey v. Ohio,* 273 U.S. 510, 535, 47 S. Ct. 437, 445, 71 L. Ed. 749 (1927)); *see also Bolden v. State,* 262 Ark. 718, 720, 561 S.W.2d 281, 283 (1978); Code of Judicial Conduct, Canon 3(C) (1972) (judges should disqualify themselves when their impartiality "might reasonably be questioned").

*Smith, supra.*

Based upon this well-established precedent regarding the recusal of judges, I would hold that Judge Fox should have recused in this case on the basis that he held Mr. Perroni's client, Mr. Ross, in jail out of what Mr. Perroni calls "animus and retaliation" and that he conducted an *ex parte* investigation at his own expense to obtain evidence that he admitted against Mr. Perroni in his contempt proceeding. The actions of Judge Fox were the subject of litigation in which both Judge Fox and Mr. Perroni were adversaries. It is troubling to me that Judge Fox later recused on May 22, 2003, from the *Ross* case after declining to recuse from the contempt proceedings against Mr. Perroni. In my view, Judge Fox should have recused at an earlier date.

### A. Holding Mr. Ross in custody

From the record before us, it appears to me that Judge Fox gave the appearance of retaliation toward Mr. Perroni through his client, Mr. Ross, when Judge Fox took Mr. Ross into custody.

On the afternoon of Wednesday, February 11, 2003, Mr. Perroni's law partner, Mr. James, appeared before Judge Fox to secure Mr. Ross's release from custody and to request that the charges against Mr. Ross be dismissed. The following colloquy occurred:

> THE COURT: Have you had a chance to visit with your client [Ross] about whether he's intending to keep present counsel or find substitute counsel?
>
> MR. JAMES: I have not, Judge.
>
> THE COURT: All right.

MR. JAMES: Right now, I'm just — and let me say this, Judge, we're here for a bond.

THE COURT: No. We're not here for a bond.

MR. JAMES: Well, —

THE COURT: He is in the custody of the court at the present time.

MR. JAMES: Respectfully, I'd submit it is this court's obligation to post a bond for this man. And then the issues are: Will he appear at the hearing? Is there basis to hold him?

As I read your order — and whether I agree or disagree with it, it's irrelevant. But the fault or the blame, to a large extent, was cast upon counsel, not upon this man who has been here for these hearings and who has not shown any indication of not being at trial.

And I would submit that he is being unfairly punished for this, whether intentionally or unintentionally, and he should not bear the brunt.

\* \* \*

THE COURT: Mr. James, I wasn't inquiring about when federal court starts because I wanted Mr. Perroni to come over here at this point in time and try another full couple of days. . . . I was simply inquiring as to whether there was going to be some time on my docket, either before or after the federal court started, in the next day or so that Mr. Perroni could come over here so we could find out when we can have a trial date and so that I can make a final decision as to what I'm going to do.

And I think you need to be careful about saying that you want to characterize this as is a demand for a bond hearing, because a bond hearing, each side needs to have plenty of time to get whatever witnesses here that they want for the bond hearing to have a correct bond hearing.

MR. JAMES: Let's put it this way, we're asking that Mr. Ross be released, period.

THE COURT: Then that's not the same as a bond hearing, I don't believe, Mr. James.

MR. JAMES: Well, Judge, I mean, in effect, I respectfully disagree.

\* \* \*

MR. JAMES: Well, Judge, we'd ask that Mr. Ross be released immediately.

THE COURT: That's denied.

MR. JAMES: Can I have the reasons in the record, please, sir?

THE COURT: I have gone over all your motions, and I have ruled on them, Mr. James.

MR. JAMES: But I don't understand, Judge, the —

THE COURT: Are you requesting a bond hearing?

MR. JAMES: Judge, I'm asking that he be released on bond immediately; and that if he is not released, that the reasons be stated for the record.

THE COURT: Okay. I'm not going any further with going over anything, Mr. James. And if I had counsel for the defendant here for even maybe fifteen minutes so that we could look at scheduling a trial date to continue this matter and get it resolved, then perhaps we could get into that. We don't have that.

MR. JAMES: Judge, I don't understand the urgency for this today when there's one trial ongoing and this one is not. So, again, I'm going to ask that you state the reasons that this man is being held without bond and is not being released.

THE COURT: All right. Let's set a bond hearing date.

\* \* \*

THE CASE COORDINATOR: We could do it either tomorrow or Friday.

THE COURT: Well, do we have jury trials tomorrow or Thursday?

THE CASE COORDINATOR: No. We do not have a jury trial tomorrow. We have reports only. We could do it as —

THE COURT: Let's do it Friday morning.

THE CASE COORDINATOR: Okay.

MR. JAMES: Judge, we would ask that it be tomorrow morning. This was part of the date that the court had set for this trial. This man is being held without bond during that time period, so we would respectfully not only request that it be held first thing tomorrow, but this court also take judicial notice of the previous proceedings in which Mr. Ross was released on bail.

As I hear the State, they're saying they don't have any witnesses. Bond has been in place. There have been no facts with regard to this man sitting here which would justify any type of revocation. There has been no evidence of any type of change of circumstances.

And, in the meantime, he's being held without bond, and we respectfully submit, Judge, that's unconstitutional. That's contrary to both —

THE COURT: You've made that — Mr. James, you've made that argument, and I believe that that's clear for the record that you've made that argument. Now can I have a bond hearing Friday morning?

MR. JAMES: Can the court state on the record why we're not having a hearing tomorrow?

THE COURT: I'm not going to go over that again. Can I have a bond hearing for Friday morning, please?

THE CASE COORDINATOR: February 14, 9:30.

THE COURT: Now, Mr. James, if I can have the person [Mr. Perroni] that's going to try the defense of this case for the defendant here for even a very short period of time, any time between now and then that we can arrange to get Mr. Ross here, then I can think about moving this case forward and think about resolving the other problems with this case; but you're not the person that can do that.

MR. JAMES: So you're going to hold him hostage till you get that?

THE COURT: No, that's not it.

MR. JAMES: Without bond, contrary to the Arkansas Constitution.

THE COURT: Mr. James, —

MR. JAMES: We renew our motion to recuse, Judge, on the basis of those comments.

THE COURT: Okay. Okay.

MR. JAMES: Will you please rule on that?

THE COURT: That will be denied.

MR. JAMES: Thank you.

The adversarial tone of this colloquy is evidence of Judge Fox's retaliation against Mr. Perroni by punishing his client, Mr. Ross, for Mr. Perroni's failure to appear as scheduled and by refusing to release Mr. Ross on the bond he had already made, or to set Mr. Ross's bond hearing immediately or for the following day on Thursday, February 12, 2003. Mr. James represented to the court that Mr. Ross's existing bond was still "in place" and that he should be released. Mr. Ross did not appear to be a "danger" under Ark. R. Crim. P. 9. However, Judge Fox refused to set a bond hearing and ruled that Mr. Ross, who had already made bond and who had previously been released, should be incarcerated for two days until a bond hearing would be held on Friday, February 14, 2003.

It appears that Judge Fox had a change of heart after holding Mr. Ross without bond for one night, as he held a bond hearing for Mr. Ross the next morning on Thursday, February 13, 2003, during which time he revealed that he had instructed his staff to call the bonding company to inquire whether "they'll stay on the bond." After the hearing, Judge Fox ruled from the bench that he would release Mr. Ross on the condition that the bond remained and that Mr. Ross takes two weeks to find an attorney for his newly-scheduled July 29 jury trial.

Article 2, § 8, of the Arkansas Constitution provides that "All persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses, when proof is evident or the presumption great." A criminal defendant has an absolute right before conviction, except in capital cases, to a reasonable bail. *Reeves v. State*, 261 Ark. 384, 548 S.W.2d 822 (1977). *See also Duncan v. State*, 308 Ark. 205, 823 S.W.2d 886 (1992).

Based upon this precedent, Judge Fox should have released Mr. Ross on bail. There is an appearance that Judge Fox retaliated against Mr. Perroni by refusing to release Mr. Ross on the bond he had already secured and by keeping him in jail overnight. By rescheduling the bond hearing for early Thursday morning, particularly after being so adamant about having it scheduled for Friday morning, Judge Fox gave the appearance of trying to un-do a hasty decision made out of retaliation against Mr. Perroni. Based upon precedent involving the recusal of judges, as well as our standard of review, I would hold that Judge Fox should have recused at the time that Mr. Ross's incarceration was considered.

### B. Ex parte investigation

In my view, Judge Fox should also have recused because he conducted an *ex parte* investigation in violation of Canon 3(b)(7) of the Arkansas Code of Judicial Conduct.

In contempt cases, a judge sits as a fact-finder. *See Ivy v. Keith*, 351 Ark. 269, 92 S.W.3d 671 (2002). However, the role of a judge as a fact-finder does not include conducting an independent investigation of the case before him. The Commentaries to Canon 3(B)(7) provide:

> Certain *ex parte* communication is approved by Section 3B(7) to facilitate scheduling and other administrative purposes and to accommodate emergencies. In general, however, a judge must discour-

age *ex parte* communication and allow it only if all the criteria stated in Section 3B(7) are clearly met. A judge must disclose to all parties all *ex parte* communications described in Sections 3B(7)(a) and 3(B)(7)(b) regarding a proceeding pending or impending before the judge.

> *A judge must not independently investigate facts in a case and must consider only the evidence presented.*

*Id.* (emphasis added) *See also Horton v. Ferrell*, 335 Ark. 366, 981 S.W.2d 88 (1998) (holding that a special master, who is subject to the Code of Judicial Conduct, obtained evidence in an *ex parte* investigation).

Here, Judge Fox conducted an independent investigation when he instructed Mr. Eanes to go to the federal courthouse to review and to copy the *Pirani* pleadings that he later introduced against Mr. Perroni in the contempt hearing. The copies of these pleadings were paid for by cash out of the judge's pocket and by a check from Mr. Eanes's personal checking account. It appears that Judge Fox conducted this *ex parte* investigation of the federal proceedings to determine the veracity of Mr. Perroni's statements about a conflict between the *Pirani* case and the *Ross* case. These actions constitute a clear violation of Canon 3(B)(7) and display a bias that requires recusal from the case.

In contempt proceedings, a judge determines the credibility of witnesses. *See Ivy, supra.* However, a judge's actions should not go beyond the boundaries established in Canon 3B(7). The sitting judge "must consider only the evidence presented." *See* Commentaries to Canon 3(B)(7). Here, Judge Fox already had the evidence of the federal scheduling order before him. As the majority points out, "On February 10, 2003, Perroni had a letter delivered to Judge Fox, renewing his motions for continuance and to withdraw as counsel. He enclosed a copy of Judge Wright's scheduling order which reflected that Steve Pirani's trial was to begin on February 10, 2003." If additional evidence was required, Judge Fox could have appropriately ordered Mr. Perroni or the State to provide a copy of the federal docket, as well as any copies of the *Pirani* federal pleadings, to him prior to the contempt hearing. However, Judge Fox directed his employee, Mr. Eanes, to assist in his personal investigation of the facts, and the material obtained through this *ex parte* investigation was then introduced by Judge Fox as evidence for his own consideration during Mr. Perroni's contempt proceedings over which Judge Fox presided.

Based upon these actions, it appears that Judge Fox became "embroiled in a personal dispute" when he conducted an independent *ex parte* investigation. *Clark, supra.* Therefore, based upon our well-established case law regarding a judge's recusal, as well as our Canons in the Code of Judicial Conduct, I believe that Judge Fox abused his discretion in refusing to recuse at that time.

### *IV. Contempt*

For his second point on appeal, Mr. Perroni argues that, as a matter of law, there is insufficient evidence to find him in "willful contempt" under Ark. Code Ann. § 16-10-108(a)(3) (Repl. 1999).

The purpose of criminal contempt is to preserve power, vindicate the dignity of the court, and punish for disobedience of the court's order. *Fitzhugh v. State,* 296 Ark. 137, 752 S.W.2d 275 (1988). Pursuant to Ark. Code Ann. § 16-10-108(a)(3), a court has the power to punish, as for criminal attempt, a person for "[w]illful disobedience of any process or order lawfully issued or made by it." *Id.* However, a judge's power to punish for criminal contempt is not limited by § 16-10-108, as such power is inherent in the courts and goes beyond the power given to judges by statute. *Fitzhugh, supra.*

A criminal contempt citation must be based on evidence beyond a reasonable doubt. *Witherspoon v. State,* 322 Ark. 376, 909 S.W.2d 314 (1995). That determination should be made by the judge selected to hear the contempt charges following Judge Fox's recusal. Only then can an appellate court review a decision unaffected by the appearance of bias. I note that while Mr. Perroni might have rearranged his federal and state trial schedules at an earlier date, his assertion that he did not recognize an actual conflict between the federal *Pirani* case, which was scheduled for February 10, 2003, and the state *Ross* case, which was scheduled for February 11, 2003, until the telephone conference on January 31, 2003, is a question of credibility and should be considered by a trial judge who is not embroiled in a personal dispute with the defendant. Mr. Perroni contended that it "was just decided by Judge Wright just a few days ago [January 31, 2003]" that Mr. Pirani's federal case was to be tried before his co-defendants' cases. When Mr. Perroni asked if he should file a continuance with Judge Wright in federal court, Judge Fox responded, "No." Under *Fitzhugh, supra,* there is an unresolved issue whether the circumstances of this case would support a finding of sufficient evidence

of willful contempt under the statute. Therefore, I would reverse and remand in order that Judge Fox recuse and that a replacement judge be appointed to conduct the hearing.

Because I would hold that the case should be remanded for an impartial tribunal to preside over the contempt proceedings, there is no need to address Mr. Perroni's third point on appeal involving his right to a jury trial.

### V. Conclusion

An analysis of these issues is not given in the majority opinion. Based upon our standard of review regarding the recusal of judges, as well as Canon 3(B)(7), I would hold that Judge Fox did not avoid all appearances of bias when he conducted an independent *ex parte* investigation to obtain evidence, namely the scheduling order, that had already been presented to him. Because I would hold that Judge Fox should have recused, I would reverse and remand for another judge to preside over the contempt proceedings against Mr. Perroni. Therefore, I would reverse and remand.